## PEOPLE v. SEKESON.

(Supreme Court, Appellate Division, First Department. March 9, 1906.)

1. CRIMINAL LAW—EVIDENCE—UNCONNECTED PRIOR OFFENSE.

In a prosecution for the larceny of certain jewelry, a confession by defendant that some months before he had stolen another piece of jewelry from another person was inadmissible; there being no legal connection between the two offenses.

[Ed. Note.—For cases in point, see vol. 14, Cent. Dig. Criminal Law, § 822.] .

2. SAME—PREJUDICIAL ERROR.

The admission of such confession was prejudicial, entitling defendant to a new trial.

[Ed. Note.—For cases in point, see vol. 15, Cent. Dig. Criminal Law, § 3137.]

Appeal from Court of General Sessions, New York County.

Milton M. Sekeson was convicted of larceny, and appeals. Reversed and new trial ordered.

Argued before O'BRIEN, P. J., and PATTERSON, INGRAHAM, LAUGHLIN, and CLARKE, JJ.

Aaron J. Levy, for appellant.

E. Crosby Kindleberger, for respondent.

PATTERSON, J. The defendant was indicted for the crime of larceny in the first degree, and upon trial in the Court of General Sessions of the Peace in and for the city and county of New York was found guilty of the charge. There were two counts in the indictment: The first charging him with feloniously stealing, taking, and carrying away on the 15th day of July, 1903, a number of articles of jewelry, the property of one Joseph Rosenthal; the second with feloniously receiving and having in his possession the property alleged in the first count to have been feloniously stolen, taken, and carried away. The prosecution abandoned the second count. Among the articles charged to have been stolen by the defendant was a pin of the value of $550. It was a bar diamond pin. There was another pin mentioned in the indictment bearing the letters Y. P. C. It was of a badge of membership of a club called the "Young Potomac Cadets" and was of trifling value. While the general drift of the evidence on the part of the prosecution tended to show that the defendant originally might have taken all the articles enumerated in the indictment, yet the case seems to have gone to the jury finally upon the question of the theft of the diamond pin only; the learned recorder stating in his charge that:

"If the diamond pin in question belonged to the complaining witness, and the defendant intending to deprive the owner of its possession took it away, he stole it and is guilty of larceny.",

It seems to be plain that during the trial, and in the ultimate presentation of the case to the jury, the guilt or innocence of the defendant was made to depend upon his felonious or innocent possession of this one selected, particular article, mentioned in the indictment, although it was charged to have been taken from a box in a safe in which all the abstracted articles were kept. The principal witness for the prosecution

was Joseph Rosenthal, who testified that he was the owner of the jewelry mentioned in the indictment, all of it having been a gift from his mother.; that it was kept in a box in a large safe in the jewelry store of his father at No. 254 Bowery, in the city of New York; that the defendant was his intimate friend and very close social relations existed between them, as well as between the families of which they were respectively members; that the defendant frequently spent the night with the witness, sleeping in apartments above the store. Rosenthal, Sr., had sustained injuries due to an accident, and went to the upper part of the city to the house of his brother, whereupon the witness invited the defendant to stay with him while his father was sick. The invitation was accepted, and the defendant slept in the same room with the witness, going into the store every day. This witness also testified that on July 8, 1903, he showed all of the jewelry mentioned in the indictment to the defendant; that the diamond pin was there and also the Y. P. C. pin; and that he put all of the jewelry back in the box in the presence of the defendant. The witness did not look at the box again until the 14th of July, six days after he states he showed it to the defendant. The key of the safe the witness kept on a bunch of keys, which, after showing the defendant the jewelry, he threw upon a desk in front of the safe and behind the counter. When the witness undertook on the 14th to open the safe, he found the key was missing from the ring. The safe then was forced open, and it was discovered that the jewelry was gone. He states that he notified the defendant, who said: "Don't worry, they must be around here some place." Search was made through the store for the missing articles, and detectives were employed to aid in that search. On the 15th of July the defendant came to the store, took off his coat and hung it up in a room back of the store, and put on another coat and went away. One of the officers suggested that the pockets of the coat which the defendant had taken off and hung up should be examined. The witness says he looked in the pocket and found in one of them the Y. P. C. pin, which he insists was his pin, and that the defendant, returning, asked if the jewelry had been found, and he was told it had not. He was not informed that the pin last mentioned had been found in the pocket of his coat. He then assisted in the search. Meantime, according to the statements of young Rosenthal, a thorough search had been made through the whole premises, without success, and on the 17th of July the defendant, being with him upstairs, declared that the jewelry must be somewhere around and went to the office and in about 20 minutes returned with a handful of jewelry, saying: "I found the jewelry." He laid it on a trunk, and the witness says he asked the defendant to go down stairs and show where he had found it. They went down and the defendant pointed to a spot which the witness says he and his uncle no less than three times had examined. The defendant brought up all the jewelry, except a couple of small pieces. Everybody congratulated the defendant, and then he was told that the large diamond pin was missing, and Rosenthal, Jr., swears that the defendant said it was odd that that pin should not be found with the rest of the goods, as it was there... It was subsequently traced to a pawnbroker's office, and it sufficiently appears in the proof that the defendant took it there and,

pawned it in the name of "Kahn." Evidently all the articles mentioned in the indictment, with the exception perhaps of one or two very small ones and the large diamond pin, were recovered by or restored to the owner on the 17th of July.

Two witnesses for the prosecution, namely, Krouch and Firneisen, police officers, corroborated the story of Joseph Rosenthal relating to the discovery of the Y. P. C. pin in the pocket of the defendant's coat. Krouch's connection with the case began on the 15th of July. He testified that he was present when the small pin was discovered, and also that he had searched the place at which the defendant stated he found the other jewelry. He made the arrest of the defendant, stating to him that it was for stealing the jewelry at Rosenthal's. He asked the defendant if he ever owned a silver badge with "Y. P. C." on it, and the defendant said, "No." The defendant asked if he could talk with Joseph Rosenthal and was told he could. This witness then states the conversation. He says that the defendant asked Rosenthal, "What do you want from me?" and Rosenthal replied that he wanted "that three-stone pin that you took." The defendant said he did not take it. Rosenthal said: "Yes, you did. I am not doing this for your sake, but I am doing it for your family's sake, and I want it." The defendant said "The pin is all right." Then this officer remarked: "What do mean by all right." The defendant said, "Well, the pin is pawned," and stated that he pawned it the day after the jewelry was found; that he kept the pin and pawned it in the name of "Kahn" and received $250. This witness also testified that he discovered at the pawnbroker's that it had been pledged on the 11th of July, which is the day on which the larceny was committed as charged in the indictment. After the arrest, this officer had a further conversation with the defendant. The court remarked that if the conversation did not relate to the transaction the witness should not narrate it. He testified that it related to a piece of jewelry which had been taken previously, a pair of earrings. Another witness, Firneisen, testified to a general search that had been made through the apartments for the jewelry. And still another, a detective sergeant (Granville) testified to a conversation with the defendant respecting the pawning of the diamond pin. He declared that the defendant said that he had pawned it on the 18th, but this witness discovered that it was actually pledged on July 11th, for $150 in the name of one "Kahn." The defendant, sworn on his own behalf, testified to the intimacy existing between young Rosenthal and himself and the friendly relations between the two families. He also swore that he was a member of the Y. P. C. club, that it was a schoolboys' club to which he at one time belonged, that the badge found in the pocket of the coat was his property, and that he had it in the coat pocket on the day it was found. He also testified that young Rosenthal never was a member of that club; that he had seen the box of jewelry a number of times; that July 8th was not the first time he saw it, but he did see it on that day; that he remained with Rosenthal up to the 14th of July; that, on the morning after the night of the discovery of the disappearance of the jewelry, young Rosenthal said to him that the box of jewelry was gone; that at the direction of the defendant young Rosenthal made out a list of the

jewelry that was missing, and there was nothing on that list concerning the three-stone bar pin, and that he did not say anything about the pin being in that box; that young Rosenthal, in April, was at the defendant's father's house and had the pin with him, it was a Sunday afternoon, and he came to take dinner with the defendant's family; that young Rosenthal then produced the pin and said to a Mr. Levine, who was present: "Levine, I got a bargain for you. Here is a nice pin. Buy it." Levine said: "I haven't got any money just now." Rosenthal then said to the defendant: "Mike, won't this look nice for Ma"— meaning the defendant's mother. The defendant replied, "I don't know. I will see what the folks say, and if they say I shall buy it I will consider it." The defendant testified that "a couple of days afterwards" he bought the pin for his mother, and that she had been wearing it ever since, until it was pawned; that he agreed to pay Rosenthal $225 for it, and that his mother wore the pin very often when she went out; that on the 11th of July his father came to his mother and asked her to let him have it; that he wanted to raise some money for the completion of a contract to do some work on a house on Madison avenue; that he (the defendant) pledged the pin at Simpson's for $150 and used a different name because he had never been in a pawn shop before and did not want his name used in such a shop. He claims to have paid $100 on account of this pin. He then testified to finding the jewelry and its delivery by him to young Rosenthal. He also swore that he was a member of the Young Potamac Cadets until 1898. Isaac Sekosky, the defendant's father, testified that young Rosenthal was a frequent visitor at his house and had been for a number of years coming there as a schoolboy friend of his son; that he remembered Rosenthal, Jr., coming to his house in the month of February, March, April, May, and June, 1903, and on various occasions showing different kinds of jewelry, and that he showed the diamond pin in question. The first time the witness saw it was in the latter part of April, 1903. His wife, daughter, son, and a man named Levine were also present. Rosenthal, Jr., tried to sell it to Levine, who said he did not have the money to buy it, and then he offered it to the defendant, saying, "Buy it for Ma." It was not bought on that day. Subsequently the defendant brought it home and said: "Mama, I bought that pin." It was a couple of weeks later. "My wife wore it after during the months of May and June. She wore it on Sundays and Saturdays when she used to go out. She wore it to a wedding." Hyman Levine, a witness on behalf of the defendant, also testified to the fact that Rosenthal offered to sell him a pin with three stones and he afterwards saw the pin on Mrs. Sekeson, the defendant's mother, in the house, as she went away to a wedding. Mrs. Sekeson, the mother of the defendant, testified to the offer of Rosenthal to sell the pin to Levine, who would not buy it, and that her son gave it to her in the early part of May. Sophie Sekeson, a sister, corroborates her mother and her father as to the offer of Rosenthal, Jr., to sell the pin to Levine and his subsequent suggestion to the defendant that the pin should be bought for his mother, and this witness recognized the pin on the trial, and she could not be mistaken about it; that her mother wore it on several occasions; that she so wore it at a wedding at Webster Hall; that Rosenthal, Jr., was

.there, and that he went in the same carriage with her mother. Bertha Sekeson, the mother of the defendant, testified that she wore the pin at :that wedding, and that Rosenthal rode with her in the same carriage, .and that she had the pin on then. Witnesses were then produced on behalf of the defendant who testified concerning the "Young Potomac ·Cadets," and their testimony was to the effect that Rosenthal was not a member of that club, but that the defendant was.

In rebuttal the prosecution introduced evidence as to the club badge or pin and that young Rosenthal was a member of the club. It was sought to identify the pin as belonging to the latter by the mark of solder which had been used in repairing it. Two witnesses, namely, Robert J. Rosenthal, the uncle, and Geneva Rosenthal, his wife, testified that the three-stone diamond pin was in the possession of the wife for several days in the early part of July; that she borrowed it; and that it was returned before the eleventh day of that month. From whom it was borrowed, whether from young Rosenthal or from his father, does not appear. It is a noticeable circumstance that young Rosenthal in his testimony does not refer to the diamond pin ever having been out of his possession before the 11th of July. On his direct examination he was asked specifically to state to whom, other than the defendant, he had showed that pin, and he made no reference whatever to the very important fact, if it be a fact, that his aunt had borrowed and used it at a time so near the day named in the indictment.

From this general statement of the evidence respecting the ownership ·of the society or badge pin found in the pocket of the defendant's coat, .and the conflict concerning the way in which the defendant became possessed of the diamond pin, which he pledged, it is easily seen that the jury might have found either way as to the guilt or innocence of the defendant; and, if there were nothing further in the case to affect the verdict, we should not be inclined to disturb it.

There was introduced in the case, however, an element which may have had great influence with the jury and may have inclined them to pronounce the defendant guilty. That element is an alleged confession of the defendant that he had been guilty of larceny at an earlier date in taking a pair of earrings, the property of young Rosenthal's father. The record as to those earrings is curious. On the redirect examination of young Rosenthal, in answer to a question of the district attorney, he stated: "We missed a pair of diamond earrings in April." That was objected to, and the court stated that it would sustain the objection unless the district attorney intended to connect it. Such intention was announced. The court was unable to perceive that the matter was material, but received the evidence subject to a motion to strike it out if not connected. Subsequently the same witness testified that the defendant told him after his arrest where the pair of earrings was. The court then sustained an objection to evidence concerning the earrings, and the subject seems thereupon to have been dropped, until the detective Krouch was examined. He, after testifying respecting the ·defendant's confession as to the diamond pin, stated that in conversation with the defendant reference was made to "another piece of jewelry which had been taken," a pair of earrings. Again the court appears to have ruled out evidence of this conversation. On rebuttal Robert J.

Rosenthal testified that he had had a conversation with the defendant on the 19th of July, and was asked whether he had heard any other conversation that took place between the defendant and any other person on that day or any day after that. His reply was in the affirmative, and he was asked what the conversation was. He swore that he said to the defendant: "There is a couple of pairs of diamond earrings that have been missing." The defendant's counsel objected to any testimony of that character and asked that it be stricken out. The objection was overruled and an exception taken. Counsel for the defendant referred to the fact that all evidence of the character had been stricken out the day before. The witness testified that he said to the defendant, "If you pawned them for a smaller amount, why, let us know about that, and we will get them"——to which the defendant responded, "If you will have me remanded, I will see what I can do." Subsequently this witness saw the defendant again and testified that the defendant said: "I took them earrings and I made them into studs. I pawned them in Simpson's in Forty-Second street and got, I think, $160 for one and $140 for the other." That evidence was received under objection and exception. Young Rosenthal, on being recalled, produced a pair of earrings in court. He said he heard the conversation between the defendant and the police officers relating to the diamond earrings which had been turned into studs; that those produced in court were the articles. Defendant's counsel objected to evidence concerning them, saying that that transaction was not before the jury, and they were not in a position to explain anything in connection with it; that "it is purely a collateral matter, not connected in point of time and circumstances with the charge at bar." The court then ruled that evidence of that transaction "was bringing up collateral matter," and sustained the objection.

Thus it will be seen that evidence as to those earrings was admitted when given by one witness, and was rejected when another was interrogated concerning the same articles. But the testimony of the one witness as to the confession respecting them remained in the record, and in the charge to the jury the court made no allusion to the condition of the evidence on the subject. With that evidence in the case, unless the jury were charged specifically respecting it and were told they were not to consider it, it is not difficult to comprehend how potent or how prejudicial it would be as affecting their judgment in reaching a conclusion adverse to the defendant. It is not permissible to introduce evidence of an independent crime to establish the guilt of a person indicted for a specific offense. As was remarked by Church, C. J., in People v. Crapo, 76 N. Y. 292, 32 Am. Rep. 302: "An accused person is required to meet the specific charge made against him and is not called upon to defend himself against every act of his life."

The learned district attorney insists that the evidence was admissible, in that it showed a systematic scheme of larceny pursued by the defendant. Evidence of such a systematic course is sometimes admissible; but it must be in pursuance of a single design, as was the case in People v. Zucker, 20 App. Div. 363, 46 N. Y. Supp. 766, affirmed in 154 N. Y. 770, 49 N. E. 1102. In People v. Molineux, 168 N. Y. 264, 61 N. E. 286, 62 L. R. A. 193, speaking of exceptions to the general rule which excludes proof of extraneous crimes, it is said:

"There must be evidence of system between the offense on trial and the one sought to be introduced. They must be connected as parts of a general and composite plan or scheme, or they must be so related to each other as to show a common motive or intent running through both. Some connection between the crimes must be shown to have existed in fact and in the mind of the actor, uniting them for the accomplishment of a common purpose, before such evidence can be received."

The last utterance as to the law constituting an exception to the general rule as to the inadmissibility of evidence respecting independent crimes is in People v. Loomis, 178 N. Y. 400, 70 N. E. 919. The independent unrelated and unconnected crime cannot be established by the confession of the alleged criminal any more than it can be by extrinsic evidence. It is obvious that the alleged confession of the defendant respecting the earrings was made during another conversation than that in which it was claimed he admitted the larceny of the diamond pin. There was no legal connection between the two offenses. They differed as to time and circumstances, and it is not shown clearly from what particular place the earrings were taken, if that is important. Nor was the evidence necessary to show intent. If the jury believed the witnesses for the people, the intent with which the diamond pin was taken is so manifest that no one could question it.

On the record before us and in view of all that appears therein, we are convinced that this defendant should have a new trial. As was remarked in People v. Loomis, supra, it cannot be said that the error in admitting this unexpunged evidence did not affect the substantial rights of the defendant. It may be that he would have been convicted without out the evidence of his confession of an antecedent larceny, "but it is enough to say that it may also have been sufficient to resolve against him any reasonable doubt that might previously have been entertained as to his guilt."

The judgment of conviction should be reversed, and a new trial ordered. All concur.