# COURT OF APPEALS,

## April 1916.

## THE PEOPLE v. EDWIN VAN AKEN.

(217 N. Y. 532.)

(1.) MURDER—CONVICTION OF DEFENDANT FOR MURDER OF HIS WIFE UPON CIRCUMSTANIAL EVIDENCE—ERRONEOUS RULING AS TO THE EFFECT OF EVIDENCE OFFERED TO SHOW THAT DEFENDANT HAD FORGED THE SIGNATURE OF HIS WIFE TO A NOTE.

The theory of the People on the trial of defendant for the murder of his wife was that the defendant was wasting his money and that his wife was trying to restrain him. Testimony was allowed upon the question of motive to the effect that a note made by the defendant bore or seemed to bear the indorsement of the wife; after her death, but before the maturity of the note, the defendant paid it in full and destroyed it. The People asked the jury to say that the defendant's conduct in paying the note before maturity justified the inference that he had forged his wife's indorsement and was making payment to avoid discovery. There is no evidence whatever that a forgery had been committed, while defendant testified that the indorsement was genuine. Defendant's counsel asked the court to charge "that there was no evidence that the defendant forged the name of his wife." The court said: "I charge that there is no direct, positive evidence, but if there is any inference to be drawn from the evidence in relation to the signing of the note, it is for the jury to draw any they think proper." *Held,* that it is impossible to sustain this ruling, since to hold that the note was forged is to indulge in unsupported conjecture.

(2.) SAME—ERRONEOUS EXCLUSION OF EVIDENCE TO EXPLAIN EVIDENCE OF-FERED BY THE PROSECUTION AS TO THE ACKNOWLEDGMENT OF A MORTGAGE BY DEFENDANT AND HIS WIFE.

Testimony was admitted that a proposed mortgage, which required the signature of the defendant and his wife, was drawn by the attorney for a person to whom defendant had applied for a loan. In the certificate of acknowledgment the draftsman had filled in the names of the mortgagors in advance of execution. The People proved that the defendant brought the unsigned mortgage to a notary, and asked that the acknowledgment be certified. The notary called the de-fendant's attention to the omission. Defendant answered that his wife

had gone to New York but would sign later. The notary struck her name from the certificate, certified to the acknowledgment of the mortgage by the defendant, and told him to bring his wife to the office when she returned, and that the certificate would then be made applicable to her. Defendant did not return and the notary never heard of the transaction again. Defendant testified that the loan was abandoned, and denied that his wife had refused to sign the mortgage. There is no evidence that she did refuse, and none that he ever forged her signature, or ever planned to forge it. Defendant attempted to prove also by the draftsman of the mortgage that it was common practice for the names of the parties to be written in the certificate of acknowledgment in advance of the execution. This testimony was excluded. *Held*, error both in receiving the conversation with the notary and in excluding evidence that the common practice had been followed in the form of the certificate.

(Argued March 9, 1916; decided April 11, 1916.)

APPEAL from a judgment of the Ulster County Court rendered June 21, 1915, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*Palmer Canfield, Jr., and William D. Brinnier* for appellant.

The court erred in its rulings on the admission of evidence. (People v. Van Gaasbeck, 189 N. Y. 408; People v. Camorato, 133 App. Div. 260; People v. Smith, 172 N. Y. 211.)

*Frederick G. Traver* for respondent.

The exceptions taken to the rulings of the court are without merit (Boyce v. Manhattan Ry. Co., 118 N. Y. 314; Bullock v. Oppman, 119 N. Y. 637; Brown v. Third Ave. R. R. Co., 43 N. Y. Supp. 1094; Kane v. Larkin, 131 N. Y. 300; Link v. Sheldon, 136 N. Y. 1; Parsons v. N. Y. C. & H. R. R. R. Co., 113 N. Y. 355; Alexander v. Osborn, 21 N. Y. Wkly. Dig. 298.)

CARDOZO, J.:

The defendant has been convicted of the murder of his wife. It is charged that after a married life of twenty-five years he killed her in their home at Port Ewen in Ulster county. The evidence is circumstantial. The People say that the circumstances point unerringly to the defendant as the criminal. The defendant says that the crime remains an unsolved mystery.

About noon on October 22, 1914, and probably at the hour of 12:13, the defendant took his horse and wagon from the barn and drove to Rondout, a mile away. He could have gone by the main street of the village. He went by a less freqented back road. At Rondout he made some purchases, paid a bill, had some drinks, and then returned to Port Ewen. It was a little after two o'clock when he reached his home. He put the horse and wagon in the stable, and entered the house. There was silence when he entered. He says that he laid his packages on the table, and called his wife. There was no answer. In the living room or parlor, he had a desk. It was a combination of a desk and a book case. A leaf or lid, when opened, spread out and made a writing table. He tells us that he noticed some envelopes protruding, and thought that some one must have been at the desk while he had been away. His wife had access to it, but seldom used it. He says he called her again, but there was still no answer. He went upstairs and on the floor of the bedroom he found his wife dead. There was a pool of blood at her head and another at her feet. There were wounds on the head made with a blunt instrument and the face was purple, with finger marks at the throat. Death had come through strangulation. The knees were drawn up, the skirt had been raised, and the stockings, where it was her habit to keep her money, were unclasped; the arms were lifted toward the head, and the fists clenched. Towels covered with blood were at the head and feet. Some one, it seems, had tried to wipe the blood away. But, except for the dead body and the bloody stains,

there were no signs of a stranger's presence in the room. The furniture was in its usual place. Towels neatly folded were on a rack on the washstand. One of them, unfolded the next day, revealed a stain of blood. All else was in order. The defendant felt his wife's hands and face, and found the body cold. He ran downstairs and telephoned for help. He called Dr. Ross, who lived opposite, then a neighbor, Mr. Vanderveer, and then his brother George. He did not tell them what had happened. He merely asked them to come. Dr. Ross was the first to arrive; then the others came; and later the sheriff and representatives of the district attorney.

The People charge that the defendant strangled his wife before he drove to Rondout; that he went there to establish an alibi; and that on his return he spread the alarm. The defendant answers that he left his wife alive; that she was murdered in his absence; and that $220 in the desk, and a watch and jewelry in the bedroom, were stolen by the murderer. Both the People and the defendant concede that the hour of the murder has a controlling significance. It was 2:10 o'clock when Dr. Ross examined the body. At that hour the jaws and neck were rigid, the mouth could not be opened, the fists were clenched, the ankles and knees were rigid, but not the hips; the face and neck were cold; at the hips only was there a sign of warmth. Dr. Schultze, the coroner's physician in New York city, and Dr. Chandler, an experienced physician of Kingston, testified, in answer to hypothetical questions, that the woman must have died before eleven o'clock. They based their opinion on the extent to which *rigor mortis* had set in. Their testimony was not met by the defendant with any counter testimony. It is assailed, however, as an unstable foundation for a judgment of conviction. That the progress of *rigor mortis* is subject to some variation is not denied by the People. They say that allowance for variation was made by their witnesses, and that even if death did not occur before the hour of eleven,

it may safely be found to have occurred before the hour of 12 or 12:13 when the defendant left for Rondout. They say that the opinion of the experts, if inadequate when considered by itself, becomes adequate when confirmed by other circumstances indicative of guilt. They insist that the defendant's tale of the theft of money and jewelry is fabricated. On the witness stand he said that he did not discover the theft until after Dr. Ross and Mr. Vanderveer arrived. Until then there had been no opportunity to search the desk, where the money is said to have been kept, or to observe the disappearance of the jewel box. Yet Dr. Ross and Mr. Vanderveer say that he greeted them with the statement that a tramp had murdered his wife and stolen his money and her jewelry. If he could not know of the theft, or did not know of it, until after they came, the greeting becomes a token that the tale of the theft was prearranged. The defendant's answer to this is that the memory of the People's witnesses is at fault; that he did not greet them with an announcement of the theft; and that after they arrived, he made the search and reported the loss. The People find corroboration of their own witnesses in the condition of the rooms. The defendant says that a thief opened the desk and stole $220. The desk, however, was not broken. It must have been opened with a key. The key was kept on the top of the book case behind some scroll work. It was there when the defendant returned from Rondout. Either the thief had a duplicate key, or else he had found the key behind the scroll work, and then after rifling the desk, had closed the lid, and put the key back in it hiding place. The People also say that papers in front of the money drawer were piled up neatly and in order when their witnesses examined the desk. The defendant's answer is that they were disarranged when he opened the desk, and that he put the papers in order before he showed the desk to others. The People also say that the outer door of the dwelling was fitted with a lock, that it could not be

opened without a key, and that neither there nor at any other place in the house were marks of violence visible. They insist that the defendant had a motive for the crime; that his habits were intemperate; that he was wasting his money; that his wife was checking his extravagance; that she had taken possession of his bank books; and the theory is put forward that either in some quarrel about money or in an effort to take her own little savings away from her, the defendant was led to violence and from violence to murder. The defendant answers that there was no motive. He admits that his habits were intemperate, but denies that he was in need of money. He shows that on the day of the murder he had $900 in the savings bank in his own name. He says that he had stock worth over $2,400 and mortgages worth over $11,000. He proves by neighbors who were his companions upon trips, that his relations with his wife were to outward seeming affectionate. Against this must be set some evidence, offered by the People, of recent quarrels. He also proves by the testimony of his townsmen, that though he was known to drink to excess, he was in other things of good repute. No signs of blood were ever found either on his body or on his clothes. There were blood stains, however, on the pump handle in the kitchen and on top of the sink. These stains may have been made by the murderer. They may have been made by Dr. Ross, who used the sink after his examination of the body.

We have not attempted in this summary of the case to take note of all the circmstances that make for the defendant's guilt or innocence. We have been satisfied to mark the general lines of the prosecution and the defense. We shall assume, though our disposition of the appeal makes it unnecessary to decide, that the evidence is sufficient to sustain the verdict. It is not so plainly conclusive that error in the court's rulings may be disregarded as unsubstantial. We are satisfied that error was committed on this trial to the prejudice of the defendant,

PEOPLE v. VAN AKEN.                    313

and that another jury should be permitted to pass upon his guilt.

The theory of the People was that the defendant was wasting his money, and that his wife was trying to restrain him. There is evidence that he was borrowing money from one Formansky, a money lender. Two transactions with Formansky figure in the testimony. One was a loan of $250 on the security of a promissory note; the other a proposed loan of $600 on the security of a mortgage. The note was made by the defendant; it bore or seemed to bear the indorsement of his wife; it had not yet matured when she died; and after her death, but before the maturity of the note, the defendant took it up, paid it in full, and, having received it back, destroyed it. The People asked the jury to say that the defendant's conduct in paying the note before maturity justified the inference that he had forged his wife's indorsement, and was making payment to avoid discovery; and the trial judge told the jury in effect that they might 'draw this inference if they wished. There is not a word of evidence that any forgery had been committed. The defendant was asked on cross-examination whether Formansky had demanded immediate payment on the ground that the indorsement was forged, and his answer was, "No." Not only is there no evidence of forgery; there is no evidence that up to the hour of the trial there ever was a hint of forgery. Yet the district attorney, in summing up, pressed the argument upon the jury that the payment of the note before maturity stamped the defendant as a forger, and that the concealment of the putative forgery supplied a motive for the murder. To counteract this argument, the defendant's counsel asked the court to charge " that there is no evidence in this case that the defendant forged the name of Mrs. Van Aken to any note, but, on the contrary, it is uncontradicted, the evidence shows that it is uncontradicted, that she signed her name to the note in question." The district attorney interposed: "May the Court please,

there are facts and circumstances from which the jury may draw such inferences as they see fit." The court: " I charge that there is no direct, positive evidence, but if there is any inference to be drawn from the evidence in relation to the signing of notes, it is for the jury to draw any they think proper." The defendant's counsel: " I except to your Honor's refusal, and except to the charge as made."

It is impossible to sustain this ruling. The defendant testified that the indorsement was genuine. To hold that it was forged, is to indulge in unsupported conjecture. In a case where the evidence of guilt is circumstantial, and where motive may be a decisive element, the jury were held at liberty to draw the inference that the defendant was a forger, and a forger of the name of the wife whom the People charged that he had killed.

The error and the resulting prejudice are emphasized when we consider a second transaction between Formansky and the defendant. In the summer of 1914 the defendant asked for a loan of $600 on the security of a mortgage. A mortgage was drawn by Formansky's lawyer. It required the signature of the defendant and his wife. In the certificate of acknowledgment the draftsman had filled in the names of the mortgagors in advance of execution. The People proved that the defendant brought the unsigned mortgage to a notary, one McKenzie, and asked that the acknowledgment be certified. The notary observing that the mortgage had not yet been signed by the wife, called the defendant's attention to the omission. The defendant answered that his wife had gone to New York, but would sign later. The notary struck her name from the certificate, certified to the acknowledgment of the mortgage by the defendant, and told him to bring his wife to the office when she returned to Port Ewen, and that the certificate would then be made applicable to her. The defendant did not return, and the notary never heard of the transaction again. This conversation was proved under objection and exception, and after it had been

stated, there was a motion to strike it out. Explaining the transaction, the defendant testified that the loan of $600 was to furnish funds for the purchase of real estate; that the purchase was abandoned, and with it the loan. He denied that his wife had refused to sign the mortgage. There is no evidence that she did refuse, and none that he ever forged her signature, or ever planned to forge it. He attempted to prove also by the draftsman of the mortgage that it was common practice for the names of the parties to be written in the certificate of acknowledgment in advance of execution. This testimony was excluded. If received, it would have informed the jury that there was nothing either unusual or suspicious in the form of the document as presented to the notary. The district attorney, in summing up, attempted to give to the form of the mortgage and the request for the notary's certificate a sinister significance in relation to the murder. He asked the jury to hold that there had been dissension and angry feeling. The wife was pictured as refusing to sign the mortgage, and the defendant as scheming to circumvent her by signing her name himself.

We think there was error both in receiving the conversation with the notary and in excluding evidence that the common practice had been followed in the form of the certificate. We do not doubt the right of the People to prove that the defendant was attempting to mortgage his house. That fact had some bearing on his financial condition. But we think it was not a legitimate inference that because he asked a notary to sign a certificate of acknowledgment, he meant to follow up the request by forging the name of his wife. It would, of course, have been a crime if the notary had signed a false certificate of acknowledgment, and under the statute the crime would be classified as forgery (Penal Law, § 885). Not improbably, the request for the certificate was made by the defendant in ignorance that a notary who complied with it would violate the

law.   But even if the defendant knew that the act would be a crime, the request would not be evidence against him unless some relation existed between the crime and the murder (People v. Marrin, 205 N. Y. 275).   Such a relation can be made out only through the merest guesswork.   It is the merest guesswork to infer from the defendant's willingness to procure an irregular acknowledgment that he had quarreled with his wife about the mortgage, that she had refused to sign it, and that he was about to forge her name.   There is no pretense that he did sign it.   The plan, if conceived, was never carried out.   From the request to commit one crime the jury were asked to infer that there was an intent to commit another, and, having inferred the second crime, to draw the further inference from the readiness to commit it that husband and wife had quarreled. These successive inferences are too uncertain to be permissible (People v. Scharf, 217 N. Y. 204, 211).   Ostensibly the purpose of the evidence was to characterize the relations between the defendant and his wife.   The real purpose and certainly the real effect was to brand the defendant as a forger.   The summing up makes it plain that the sole value of the evidence was to supply a basis for that inference.   The jury must have believed that the inference was legitimate.   The court had charged them that they were at liberty to infer that the defendant had forged his wife's indorsement of a note.   They cannot have failed to interpret the charge as justifying a like inference that the defendant was planning to forge her name upon a mortgage.

To dismiss these errors as unsubstantial is impossible.   They tended to awaken a resentment and a prejudice through which the trial was made unfair.   Least of all may they be ignored in a case of circumstantial evidence where the elements that make up the proof of guilt gain in combination a cumulative force (People v. Hinksman, 192 N. Y. 421, 428).   The defendant was on trial for the murder of his wife.   He was pictured to the jury as the forger of his victim's name.   The

charge of forgery has no basis in the evidence; but it was made with solemn eloquence by the People's representative, and it received in the closing moments of the trial the sanction of the court.    The line was not drawn between inference and conjecture, between legitimate deduction and unregulated suspicion.

The judgment of conviction should be reversed and a new trial ordered.

WILLARD BARTLETT, Ch. J., HISCOCK, CHASE, CUDDEBACK, HOGAN, and POUND, JJ., concur.

Judgment of conviction reversed, etc.