THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* PHEBE RYAN, Appellant.

*Crimes — blackmail — evidence — admissibility — sufficiency.*

Appeal by the defendant, Phebe Ryan, from a judgment of the County Court of the county of Greene, rendered on the 12th day of December, 1918, convicting her of the crime of blackmail.

Judgment of conviction affirmed. All concur, except Kiley, J., dissenting, with an opinion.

KILEY, J. (dissenting): This defendant was indicted by a grand jury in the Supreme Court at a term held in Greene county, N. Y., in the month of November, 1917. The crime charged is blackmail, and consisted of alleged writing and mailing to one Jacob B. Myers, a letter in words and form following:

" Mr. MYERS.— If you don't leave $500. a stone pillar of Church wall your place will go up in smoke soon. We intend to get three of you this year. Last year we let it pass but this we intend business sure. We are close by.                         Committee C. K. F."

This defendant is the mother of a large family. She was tried and convicted under this indictment in the Greene County Court and sentenced to not more than five years and four months, and not less than one year and ten months, in the State Prison for Women at Auburn, N. Y. She had never been convicted of any offense. If this conviction is sustained it seems to me it will be a mistake and that a mistaken theory was followed upon the trial. To illustrate, the witness Schoonmaker testified that he received a similar letter to the one set out in the indictment — to be exact, it is as follows: " If you don't put $200. under stone at the corner of bridge below your store it will go hard with you and you will be a loser of more if not your life beside to save trouble and life it is up to you. It means we are after you." This letter was received by Schoonmaker about July 20, 1917. His store burned down August 6, 1917. How was this fact proved upon the trial of this defendant under this indictment? Schoonmaker is on the stand: Direct examination — " Q. And your store has been burned up since, hasn't it? A. Yes. Q. And have your records been all destroyed? A. Yes." An objection to this evidence was made. If the judgment of conviction is reversed, and if I am not mistaken in my theory, it will have to be so reversed notwithstanding these omissions. There are nearly three pages of what strikes me as incompetent evidence against which the record shows but few objections, all of which would have been competent, only, if defendant was being tried for arson, viz.: The burning of Schoonmaker's store. Again over objection the People were permitted to prove that the husband of this defendant was indebted to several merchants and dealers for different kinds of commodities in that vicinity — and finally that Myers, the complainant, had recovered a judgment against Judson Ryan, defendant's husband. Not satisfied with what seems to me a violation of the rules of evidence, counsel for the People, notwithstanding objections, notwithstanding the doubts of competency expressed by the court, persisted and finally succeeded in getting before the jury, as evidence in the case, that Myers saw the defendant's husband on a *Sunday morning drunk*, and for that reason he refused defendant's husband credit. It will be observed that Myers testified that defendant's husband was good financially and owned real estate. A witness named Hallenbeck was permitted to testify that he shut off credit because his bill was not paid in full. The bill was against the responsible party, the husband, who owned real estate, clear and unincumbered. When has it

become the law that a woman, charged with blackmail, can be held responsible for financial delinquencies and drunkenness of her husband? When, in the history of jurisprudence, has it ever been held that on a charge of blackmail, the question of whether the defendant or a third party, the owner of a building which has burned, set the fire? That the prosecution could get the three threatening letters before the jury, if legally and properly procured, for purposes of comparison with handwriting acknowledged to be genuine, viz., the defendant's, has judicial sanction; but to follow it up with evidence of other social, moral and criminal delinquencies, not shown to have been committed by the defendant, and in most instances affirmatively shown to have been committed by others, robs the defendant of the last shred of legal protection which the law of evidence throws around the accused, when it is said that the presumption of innocence prevails until the contrary be shown by legal evidence. No matter how strong the suspicion may be, that the evidence upon the trial creates — the evidence should be competent, and free from extraneous circumstances, the province of which can only be to prejudice the defendant in the eyes of the jury. The evidence of fire, the judgment against the defendant's husband, and his drunkenness on the Sabbath day were incompetent. (*People* v. *Sekeson*, 111 App. Div. 490.) In *People* v. *Cascone* (185 N. Y. 331) the court says: " Thus on the trial of a man for murder, evidence was received to show that he made harlots of women and that his wife received the proceeds of their infamy. * * * It was intended to degrade him in the eyes of the jury, and if believed by them, must have had that effect." The proof we have of a fire, which occurred after any reference in letters here claimed to make it competent were written; with which fire this defendant has in no way been connected; of an improvident and drunken husband, for which the evidence, no where, makes defendant responsible, was intended to and could have no other effect than to degrade this woman in the eyes of the jury. Was this fair and orderly? Did the defendant get a fair trial? That she did not get a fair trial appears conclusively from this record. In *People* v. *Crapo* (76 N. Y. 291) the judge writing the prevailing opinion well said: " It is not legitimate to bolster up a weak case, by probabilities based upon other transactions. An accused person is required to meet the specific charge made against him, and is not called upon to defend himself against every act of his life." In this case defendant was subjected to the suspicion of being responsible for the acts of others, in no way connected with the charge in the indictment. The effect of the inference to be drawn from evidence, not germane to the charge in the indictment, receives attention in *People* v. *Van Aken* (217 N. Y. 532) The rule contended for here is stated in *People* v. *Follette* (164 App. Div. 272) with clearness, and the historical reference therein made, if this judgment is affirmed, would convict the present trial practice of retrogression rather than progression. The contention that the condemned evidence was of a scheme or plan showing a concert of action or in this case a completed intention, binding all of the circumstances together toward a common purpose, cannot be sustained. (*People* v. *Loomis*, 178 N. Y. 400.) Another feature of the proceedings deserves earnest consideration. The record

discloses that after the letters were written a John Doe proceeding was instituted in Tannersville near where defendant resides. The alleged purpose of such proceeding was to investigate the stealing of a slot machine from the Antlers Hotel. The defendant was subpœnaed as a witness in that proceeding, and it clearly appears from what took place there that the sole purpose was to get this defendant where she would write, so that a genuine sample of her handwriting could be procured to be used in proceedings against her upon the charge of blackmail. Samuel J. Killian was a post office inspector. What took place at the John Doe proceedings was testified to upon the trial of this indictment and is best shown in the examination of this witness. " Q. I show you a paper, Mr. Killian, which has been marked ' People's Ex. D.' I ask you if you ever have seen that paper before? A. I have. Q. Did you see it written? A. Yes sir. Q. Where? A. At Tannersville. Q. By whom was it written? A. Mrs. Phebe Ryan." He then says he dictated it to her; as matter of fact he read to her the Myers letter. He was then asked, " How did you come to ask her? Just tell us what took place at that time when you asked her to make this handwriting on this paper? A. There was considerable investigation going on at the time, concerning letters in the burning of buildings, and the local authorities were interested on their side and Inspector Smith and I were interested from the post office point of view." Again, "At the conclusion of the proceedings *I took advantage of the opportunity of her presence* and told her I was a post office inspector, that I was investigating the matter of these letters and seeking evidence to place the responsibility and asked her if she would mind giving me a sample of her handwriting, that she had been mentioned to me *as a suspect* and I would like it to use for the purpose of placing responsibility. *She at first protested* and in a minute or so she agreed and gave me the handwriting." This defendant was not represented by counsel at the hearing in the John Doe proceedings; and upon the trial objection to this evidence was not taken: I feel this was a mistake. However, we can consider the effect of the evidence on defendant's rights; the law will not permit her to be prejudiced, even if mistake was so made; under section 542 of the Code of Criminal Procedure we can review this evidence and say whether an invasion of defendant's rights, such as this discloses, even though not presented by objection and exception, shall be allowed to stand. This evidence of handwriting was vital to the successful outcome of the prosecution; it was not voluntary, and it was furnishing the People with the only positive evidence of this defendant's handwriting. It is urged that because defendant was only a witness in the John Doe proceedings, in no way connected with the crime with which she was later to be charged, therefore, it was competent to procure evidence as this was procured; that there was not threat nor duress. We are unaware of the fact, if it exists, that the authority charged with just and orderly administration of the law has any higher regard for fraud than it has for threats or duress. The evidence was procured by fraud and by reason thereof every element of voluntary action on part of defendant was vitiated; in addition Killian shows it was not voluntary and she swears to evidence susceptible of no other inference. No

new trail is being blazed. In *People* v. *Chapleau* (121 N. Y. 274) the court lays down the general rule governing the reception of this kind of evidence as follows: " It is thus perfectly clear that both before and since the enactment of the Code provisions, the test of admissibility of the statements of a party accused of the commission of the crime, whether made in the course of judicial proceedings or not, is whether they were *voluntary*, and that can be determined by their nature and the circumstances under which made." In *People* v. *Ferola* (215 'N. Y. 285) Judge Miller reviews a line of cases, representative of which is *People* v. *Mondon* (103 N. Y. 211), which would seem to be antagonistic to the position taken in the case at bar — and the other class of cases followed in the case under consideration, represented by 121 New York above cited, and holds the admission must be voluntary. The Constitution guarantees the defendant a fair trial. The presumption of innocence is not destroyed by an unfair trial, where the conviction is had upon incompetent evidence. A reading of this record forces an irrepressible conviction upon the mind that the defendant did not have a fair trial. The judgment should be reversed and a new trial granted to the defendant.