## 52815. PENNSYLVANIA MILLERS MUTUAL INSURANCE COMPANY v. HEULE.

WEBB, Judge.

Heule purchased from appellant a comprehensive physical damage insurance policy on a chicken house covering losses up to $35,000 sustained by fire, explosion, windstorm and hail, and supplemental coverage for other described exigencies. Coverage was afforded for "Explosion Damage: Meaning only direct loss to the property insured hereunder from explosion *caused by the rapid combustion of any volatile or combustible substance* . . ." (Emphasis supplied.)

The insured building, an "Environmental Control Layer House," was built in 1970 for the purpose of boarding baby chickens until they attained a certain weight. It was approximately 270 feet long and 35 feet wide, of wood frame with aluminum sheeting on the roof and side walls and insulated with fiberglass padding. The roof structure was composed of prefabricated rafter trusses with no internal support columns. Four rows of double metal cages in three-high tiers were suspended from the lower rafter trusses for the length of the building, with the exception of twenty feet at the utility room end and ten feet at the other end. There were 2,496 cages in the building. Ventilation was provided by twelve exhaust

fans and the building was lighted by open wiring with 40-watt bulbs down each aisle.

On July 21, 1972, Heule had completed two 20-week feeding contracts and his chicken house contained approximately 29,000 chickens ready for delivery. When he returned home that afternoon he found that the roof had caved in where the trusses over the center aisle had opened up at the gusset plate. The end gables were not affected, the fans were still on, the aluminum sheeting on the roof and sides was not dislodged and no glass was broken. In the area where the cages were warped by the falling roof, 500 chickens had been trapped in the liquid manure beneath the cages and were dead. None were cut, mutilated or burned.

Heule's chicken house was inspected by appellant's field representative and an engineer retained by appellant, who concluded that the damages resulted from a structural collapse which was not covered by his policy. Appellant denied coverage and the loss was described on Heule's 1972 tax returns as having resulted from the *collapse* of the building. However, on July 2, 1973, he brought suit against appellant alleging that his loss resulted from an explosion, and the jury found in his favor in the amount of $29,300. The insurance company appeals and we reverse.

" 'In an action to collect on an insurance policy, the insured must show that the occurrence was within the type of risk insured against to make a prima facie case.' " *Ga. Farm Bureau Mut. Ins. Co. v. Alloway,* 134 Ga. App. 660, 661 (215 SE2d 506) (1975) and cits.; *Showers v. Allstate Ins. Co.,* 136 Ga. App. 792, 793 (222 SE2d 198) (1975). Coverage under Heule's policy was for "explosion caused by the rapid combustion of any volatile or combustible substance . . .," and not for structural failures. Thus Heule was required to prove (1) that rapid combustion (2) caused an explosion. In our view he failed to do either.

Heule testified that he had no theory as to the cause of the alleged explosion but he knew there was one. His conclusion was based upon the fact that he found the chickens dead where the building was "torn up" and he knew "something had happened." He could not

distinguish between damage that would result to rafters that had broken from an overload, and rafters damaged by an explosion. He could not account for the fact that the thin aluminum siding was not blown off the building immediately over the ruptured timbers. He conceded that the buckling of the building sides would result from the sinking of the crown of the roof, which would push out the wall. A neighbor testified that he "heard a noise that sounded like an explosion." A relative who lived 300 yards from the chicken house stated that he was standing in his front yard when he heard a loud explosion; that he turned around and saw "a cloud of dust or smoke or something coming up from the chicken house"; and that "then the building began to collapse."

Heule's expert witnesses conjectured that either agricultural dust or methane gas *could* have served as the fueling substance for the alleged explosion and there was ample expert testimony as to how an explosion *could* have occurred. They also testified, however, that these substances in combustion generate heat and in rapid combustion create a flame front, *but not one witness who inspected the building saw or found any evidence of charring, burning or scorching:* "Not even a chicken feather was burned."

"It is basic that an inference can be drawn only from a fact and that whether a fact will authorize a particular inference is a matter of law. . . 'There must be more than a "scintilla" of circumstances to carry the case to the jury. *Georgia R. &c. Co. v. Harris,* 1 Ga. App. 714 [(57 SE 1076) (1907)]; Green, Georgia Law of Evidence, 86, 87, § 22. More than a "scintilla" of circumstances "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229 (59 SC 206, 83 LE 126). If it is permissible reasonably to draw a given inference from the circumstances proved, such inference is not mere speculation or conjecture. As Mr. Justice Cardozo (prior to his service on the Supreme Court of the United States) explained in People v. Van Aken, 217 N.Y. 532, 542 (112 NE 380), an inference is legitimate deduction whereas conjecture is mere unregulated suspicion. . .' *McCarty v. National Life &c. Ins. Co.,* 107 Ga.

App. 178, 182 (129 SE2d 408) . . . [And] 'When a witness states that he does not know which of two inconsistent things are true, it cannot be inferred therefrom that either the one or the other is the fact. '. . . [N]o inference of fact may be drawn from a premise which is wholly uncertain.' [Cit.]" *Layton v. Knight,* 129 Ga. App. 113, 114 (198 SE2d 915) (1973).

Combustion is "the act or instance of burning." Webster's New International Dictionary (2nd Ed., Unabridged). As established by appellant's experts, there are types of explosions which do not involve combustion, but in a combustion explosion material burns in air creating gases which cause a pressure rise. While the testimony of Heule's witnesses proved that each heard a sound which he characterized as smoke or dust or something, neither the sound of an explosion, the sight of a cloud, nor the collapse of a building creates an inference that the sound or the cloud or the collapse was caused by the rapid combustion of a volatile substance. Conversely, the absence of any signs of combustion in the building was a circumstance sufficient to support an inference that the sound heard was not such an explosion. Indeed, the circumstantial evidence adduced upon the trial was totally compatible with a structural collapse and incompatible with a combustion explosion. Under "the established fundamental rules applicable to circumstantial evidence . . . it is required that the circumstances relied upon be not only consistent with the conclusion sought to be established, but also inconsistent with every other reasonable hypothesis." *Ga. R. &c. Co. v. Harris,* 1 Ga. App. 714, 717, supra; *Radcliffe v. Maddox,* 45 Ga. App. 676, 682 (165 SE 841) (1932).

Appellate courts will labor to retain intact verdicts returned by juries. However, we are also duty bound to be just before we are generous, and "Courts have no more right by strained construction to make the policy more beneficial by extending the coverage contracted for than they would have to increase the amount of the insurance. [Cit.]' " *Cotton States Mut. Ins. Co. v. Falls,* 114 Ga. App. 812, 814 (152 SE2d 811) (1966). The burden of proof was upon Heule, and in lieu of carrying this burden with either direct or circumstantial evidence, he came forth

only with conjecture and supposition. There was *no evidence* that there was an explosion "caused by the rapid combustion of any volatile or combustible substance . . .," as provided by the policy. Accordingly, the trial court erred in overruling appellant's motion for directed verdict and for judgment n.o.v. based thereon.

*Judgment reversed. Quillian, P. J., Clark, Stolz, Marshall, McMurray and Smith, JJ., concur. Bell, C. J., and Deen, P. J., dissent.*

ARGUED OCTOBER 4, 1976 — DECIDED DECEMBER 1, 1976 — REHEARING DENIED DECEMBER 17, 1976 — 

*W. Ward Newton,* for appellant.

*William T. Darby, Sr., Charles H. Andrew, Jr., Braziel & Braziel, William F. Braziel, Sr.,* for appellee.

DEEN, Presiding Judge, dissenting.

This is an any evidence case. The question at issue was whether the chicken house collapsed as the result of explosion, a covered risk, or whether the roof just got tired and fell in. The jury decided on the former explanation. In support of this conclusion the following appears:

Two people heard an explosion. One of them immediately looked, while the roof was still in place, saw a cloud of "smoke or dust" rise up, and then saw the roof settle down and heard other and different noises, described as more metallic, during this process.

There was no wind, and no unusual downward pressure which would explain the roof giving way. However, there were atmospheric conditions which make explosion probable. It had been an extremely hot day. At 7:00 p.m., the time of the incident, it must be assumed that the outside temperature was rapidly cooling, and it was then 103° outside the building and 115° inside. The initial expulsion of smoke or dust as observed by the eyewitness was in an area of the roof where there was a "gusset plate," in other words in a weak area of the roof at a place where gases might well collect and where the temperature differential could be assumed to be the greatest. There is also testimony that the walls were pushed *out* under the

roofline where the roof had jumped and a hole had been torn out. Pictures were in evidence taken immediately after the event; the plaintiff testified as to physical findings *from the pictures,* and the jury had these pictures out for examination in their deliberations. None of the other chicken houses were affected. The ends of this chicken house were not affected. The house plan is one widely used in the midwest, known as a "snow load" type — in other words, one specially designed to accommodate exterior weight, such as snow, without caving in. As to the gas, there was a lot of chicken manure in the building, chicken manure emits methane gas, and methane gas is highly explosive. There was also expert testimony that methane gas is "extraordinarily explosive," and that where there is a metal roof such as this a contrast in temperatures within and outside the room in the roof area can cause static electricity which would be sufficient to ignite the gas.

There was also other expert testimony as to the interior dust from grain feed, and that a similar situation can arise by its collection around the series of light bulbs which lined the room aisle, the 40 watt bulbs reaching a temperature of up to $300^{\circ}$ .

Thus, there is ample expert testimony as to how an explosion might have occurred. In addition, there is the testimony of two witnesses who heard the explosion. One of these, as it happens, is also an expert, having been assigned to air force ordnance where for many years he had responsibility for gunner equipment, bombing equipment and explosives. He stated that his familiarity with explosions had trained him in distinguishing sounds; that the first sound which he heard was both an explosion and muffled, therefore identified by him as coming from within the interior of a closed surface, and that when he first looked in its direction "the building was still intact at the roof line," after which it began to collapse.

Of the two explanations offered, it appears to me that the explosion theory is the more reasonable. In any event, it is supported by eye-and-ear witness testimony and bolstered by the (admittedly contradicted) testimony of experts. Even a witness of the defendant stated (and that

on direct examination!) that had there been an explosion he would expect to find the walls bulging outward, and that in fact he did find the walls bulging out in some places. But, whether the theory is more reasonable or not, it is supported by positive lay and expert testimony, and we cannot substitute our opinion as to where the preponderance lies for that of the jury. I must therefore dissent from a reversal on the general grounds.

I am authorized to state that Chief Judge Bell joins in this dissent.