(172 App. Div. 826)

## PEOPLE v. SMITH.

(Supreme Court, Appellate Division, Fourth Department.　May 3, 1916.)

1. LARCENY ☞55—EVIDENCE—SUFFICIENCY.
　　In larceny trial, evidence that accused, in confidence of a rich woman 80 years old, retained possession of securities belonging to her after her death, and, upon action being brought by the executor to recover them, fled from the country, with admissions and untruthful statements by the accused, *held* to sustain verdict of guilty.
　　[Ed. Note.—For other cases, see Larceny, Cent. Dig. §§ 152, 164, 165, 167–169; Dec. Dig. ☞55.]

2. LARCENY ☞40(9)—INDICTMENT—VARIANCE.
　　Where larceny indictment charged taking of property of a trust company, and proof established misappropriation of such property after death of the owner, the trust company being the executor, there was no variance.
　　[Ed. Note.—For other cases, see Larceny, Cent. Dig. §§ 123, 124; Dec. Dig. ☞40(9).]

3. EXECUTORS AND ADMINISTRATORS ☞153—VESTING OF EXECUTOR'S TITLE.
　　The title of an executor to property of the estate of his decedent vests at the testator's death.
　　[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 629, 630; Dec. Dig. ☞153.]

4. CRIMINAL LAW ☞1043(2)—APPEAL—OBJECTIONS—SUFFICIENCY.
　　In a larceny trial, a general objection to testimony in former discovery proceedings that it was incompetent, immaterial, and irrelevant to the issues was not sufficient to save the objection that the testimony was inadmissible under Penal Law (Consol. Laws, c. 40) § 2443, which provides that no person shall be excused from testifying in any civil action or legal proceeding to show that a thing in action has been bought, sold, or received contrary to law, on the ground that his testimony might tend to convict him of a crime, but no evidence derived from the examination of such person shall be received against him upon a criminal prosecution.
　　[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2654; Dec. Dig. ☞1043(2).]

5. CRIMINAL LAW ☞1043(2)—APPEAL—OBJECTIONS—SUFFICIENCY.
　　Objections to testimony that assign no ground therefor will be disregarded, unless it clearly appears that the objection, if properly made,

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

would have been decisive of the case, and could not have been obviated, or unless the evidence in its essential nature be incompetent.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2654; Dec. Dig. ☞1043(2).]

6. CRIMINAL LAW ☞372(5)—EVIDENCE—RELATED TRANSACTIONS.

In a larceny trial, testimony of transactions relating to other securities *held* not so unrelated to the transaction in question as to be incompetent.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 833, 834; Dec. Dig. ☞372(5).]

7. LARCENY ☞50—EVIDENCE—ADMISSIBILITY.

In such trial, it was proper to show pendency of civil action charging accused with misappropriating the securities in question; it appearing that he secretly departed after such suit was brought.

[Ed. Note.—For other cases, see Larceny, Cent. Dig. § 142; Dec. Dig. ☞50.]

Lambert, J., dissenting.

Appeal from Monroe County Court.

Benjamin Hill Smith was convicted of grand larceny in the first degree, and appeals from that judgment and from an order denying a new trial. Affirmed.

Argued before KRUSE, P. J., and FOOTE, LAMBERT, MER-RELL, and DE ANGELIS, JJ.

P. Chamberlain, of Rochester, for appellant.
James Mann, Asst. Dist. Atty., of Rochester, for the People.

KRUSE, P. J. The defendant appeals from a judgment of the County Court of Monroe County, convicting him of the crime of grand larceny in the first degree. He challenges the sufficiency of the evidence upon which the judgment of conviction rests, and contends that errors were committed upon the trial prejudicial to him.

[1] Harriet F. Newcomb died September 24, 1913, in the city of Rochester, leaving an estate consisting largely of stocks, bonds, and other securities, amounting to several hundred thousand dollars. She had been a resident of the city for many years, and during the last 10 or 12 years of her life the defendant had been her secretary and confidential agent, was familiar with her affairs, and largely transacted her business, and for the last 8 years of her life he lived in her home. Although it does not very clearly appear, I think it may be inferred, from what appears in the record and the undisputed facts stated in the briefs of counsel, that she was upwards of 80 years of age at the time of her death, that she left no descendants, that her husband had died several years before her death, that none of her relatives lived with her, that she had a housekeeper and servants, that her relations with the defendant were intimate and friendly, that he was kind to her, and that she trusted him implicitly.

Within a week or so after her death a representative of the Fidelity Trust Company of Rochester, the executor named in her will, called upon the defendant at Mrs. Newcomb's house and obtained from him

---

certain silverware, jewelry, and securities, consisting of stock and mortgages, amounting to approximately $100,000. These securities were taken out of the defendant's desk. After expressing some surprise to defendant that these valuable papers and securities should be lying loose in the desk, the representative asked him whether there was anything else, and defendant said there was not. He asked for Mrs. Newcomb's books of account, and defendant said she kept none. He asked for bank books, and defendant produced one or two. He asked for canceled checks, and the defendant stated that they had been destroyed.

But the defendant was not frank and truthful in making these statements. Later in the day the Trust Company representative went to Mrs. Newcomb's house again, when the defendant was absent, and discovered, not only that there were books of account, but also canceled vouchers, passbooks, and other miscellaneous records covering transactions for several years, and later it was discovered that there were securities amounting in value, as is claimed, to $100,000, which at one time had belonged to Mrs. Newcomb, and for which the defendant had not accounted, among others five bonds, of $1,000 each, which he afterward sold. It is the misappropriation of these bonds upon which this conviction rests.

After this discovery had been made and was called to the defendant's attention, he declared to representatives of the Trust Company that these securities had been given to him by Mrs. Newcomb. It also appeared that Mrs. Newcomb had apparently conveyed to him, on the 30th day of May, 1913, a house and lot, situate on North Washington street in the city of Rochester, and certain Michigan real estate, and according to the defendant's statement the bonds in question were given to him at the same time.

The defendant contends that his claim is corroborated by the testimony of Myron W. Green, who was a broker and negotiated the sale of many of the securities, and was the notary public who went to Mrs. Newcomb's house at defendant's request and took the acknowledgments of the deeds, and also by the testimony of the witness Lewis P. Warner, who was a friend and former partner of the defendant. Green testified that Mrs. Newcomb stated to him, at the time he took the acknowledgments, that she wanted to give the defendant certain securities, and had given him some. According to Warner's testimony, she told him in February preceding that she had given to the defendant the "Spencer Transit" bonds, and he further testifies that he saw the bonds in question in the defendant's Mill street office on June 3, 1913. The defendant, in his testimony before the surrogate in the proceeding for the discovery of assets belonging to the estate of Mrs. Newcomb, testified that they were kept in the safe in his office from the time they were bought for her, and that he deposited the interest coupons to her credit up to the time of her death, and he also claimed to the representatives of the Trust Company that there was an agreement between Mrs. Newcomb and him that he should pay the interest to her during her life and also pay all of the household ex-

penses. It also appeared by the testimony of Quincy Van Voorhis, an old friend of Mrs. Newcomb, that he had a conversation with the defendant after her death, in which the defendant stated in substance that Mrs. Newcomb had not given him as much as people supposed; that she had given him the Washington street house and some Western lots and $3,000 in her will, and a claim in litigation against some one in New York or Brooklyn, of doubtful value, and her claim in the Dean Alvord Company, which was also of doubtful value, and that was all that she had given him, except that he showed witness a paper which purported to be an assignment of· $5,000 or $6,000 worth of stocks, and told him that it was a verbal understanding between defendant and Mrs. Newcomb that she would give him (defendant) the dividends on the stocks as long as she lived, but Thomas Brown had made a strong demand on defendant for the stocks and he had given them to Brown.

The transaction relating to. the conveyance of the real estate is itself not free from suspicion. The defendant had asked the attorney who usually did Mrs. Newcomb's legal business to prepare a deed of the North Washington street house and lot, but said nothing to him about the Michigan property. The attorney refused to draw the deed, stating to defendant that Mrs. Newcomb was sick and old, and he would not draw any deeds to the defendant without orders from her direct. That she was old and infirm at that time clearly appears. Furthermore, at about the time when it is claimed these alleged gifts were made, Mrs. Newcomb was making codicils to her will, and the defendant is not mentioned in them. The suggestion that Mrs. Newcomb wanted to give the defendant a substantial part of her property, but did not wish to make such provision by will, is not forceful, because she did give to him a legacy of $3,000 by her original will, made July 23, 1911, and that gift was not disturbed by either of the subsequent codicils, one of which was made October 11, 1912, and the other August 11, 1913, the last one only about a month before her death.

The will was probated October 10, 1913. The defendant sold the bonds October 15, 1913. Two or three weeks thereafter the discovery proceedings were instituted, and the defendant was examined. About a month later a civil action was brought by the Trust Company against the defendant, charging him with misappropriating these bonds, and other bonds and securities, amounting in all to the value, as alleged, of $100,000. Thereafter, and about Labor Day, 1914, the defendant left Rochester and went to Canada. He charged his associate in business and his bookeeper not to disclose his whereabouts. He asked them to send some of his effects to Canada, and finally went to England. He was indicted upon this charge in December, 1914, and was extradited and brought back from England to this country early in 1915. Without going into details it is sufficient to say that, from the time he left Rochester until he was arrested, he was hiding his' identity and whereabouts, and the conclusion is irresistible that he did so because of the charge which had been brought against him.

It is unnecessary to further collate the facts and circumstances. The

advanced age, confidential relation, and circumstances in connection with these various transactions, and the conduct of the defendant after the death of Mrs. Newcomb with reference to these securities, are such as to discredit the defendant's claim that these securities were honestly acquired by him. The evidence amply sustains the verdict of the jury.

[2, 3] As to the other points, the defendant contends:

1. That there is a fatal variance between the allegations of the indictment and the proof. It is urged that the offense proven, if any, was in misappropriating the property which the defendant received as custodian from the owner, Harriet F. Newcomb, and that he could not be convicted of stealing property from the Fidelity Trust Company, as its agent, servant, and bailee.

There is nothing in this contention, because upon the death of Mrs. Newcomb the title to her property was vested in the Trust Company, the executor of her will. He may have been guilty of an offense during her lifetime, but the offense of which he was convicted was committed after her death. He secretly kept possession of the bonds, and sold them on the 15th of October, 1913, on which day it is charged in the indictment he committed the offense. This was after Mrs. Newcomb's death, and after the will had been admitted to probate. One of the counts of the indictment charged the offense as having been committed while he was employed in the capacity of servant and agent and bailee of the Trust Company. The two other counts are in the form of a common-law indictment for larceny, setting forth that the property was that of the Fidelity Trust Company of Rochester. We think there was no variance, and that the indictment is proper in form. People v. Bennett, 37 N. Y. 117, 93 Am. Dec. 551; Phelps v. People, 72 N. Y. 334–337.

[4] 2. It is contended on behalf of the defendant that prejudicial error was committed in rulings upon questions relating to evidence, among others: (a) In receiving testimony of the defendant given upon the discovery proceedings; (b) showing the commencement and pendency of the civil action; and (c) in reading from the pleadings in that case.

As to the first, defendant contends that serious error was committed because, in effect, he was compelled to be a witness against himself. That contention is based upon the provisions of section 2443 of the Penal Law, which provides that no person shall be excused from testifying in any civil action or legal proceeding to any facts showing that a thing in action has been bought, sold, or received contrary to law, upon the ground that his testimony might tend to convict him of a crime, but no evidence derived from the examination of such person shall be received against him upon a criminal prosecution.

The district attorney contends that defendant was not required to give any testimony in the discovery proceedings; that he could have availed himself of the privilege of refusing to answer, citing Chappell v. Chappell, 116 App. Div. 573, 101 N. Y. Supp. 846; and that therefore his testimony is to be treated as a voluntary confession under sec-

tion 395 of the Code of Criminal Procedure. He also contends that no such question was raised on the trial; that most of the testimony was given without objection, and such objections as were interposed thereafter were directed to the point that testimony relating to other transactions than the one with reference to the bonds in question was improper; and, furthermore, that in any event prejudicial error was not committed.

The witness Joseph McLean, the attorney for the Trust Company, was called as a witness by the prosecution. He testified that the defendant had made declarations to him respecting the bonds in question, and detailed to some extent the testimony given by the defendant in the discovery proceedings. The defendant's counsel, upon cross-examination, very fully examined him, bringing out the claim which the defendant made with reference to these bonds, and it was not until after the district attorney was reading excerpts from the defendant's testimony, relating to other securities, that objection was made, and then, aside from the general objection, the specific point was made that only such testimony as related to the bonds in question was competent, and at the close of the reading of the excerpts a motion to strike out all of the testimony, except such as referred to these bonds was made, upon the ground that it was incompetent, immaterial, and irrelevant to the issues which were being tried.

[5] The point which is now made, that this testimony was incompetent under section 2443 of the Penal Law, was not even remotely suggested upon the trial. That objection should not now be permitted to prevail, even if tenable. Daly v. Byrne, 77 N. Y. 182, 187, 188; Wightman v. Campbell, 217 N. Y. 479, 112 N. E. 184; 1 Wigmore on Evidence, § 18. As was said by Judge Folger in Daly v. Byrne, supra, at page 187:

"The most favorable view of the objection for the defendant is that it was a general objection. It is a general rule that objections to testimony that assign no ground therefor will be disregarded, unless it clearly appears that the objection, if properly made, would have been decisive of the case, and could not have been obviated. Levin v. Russell, 42 N. Y. 251. The rule is based upon the sound notion that the party should let it be known to the court, and to the other side, what are the real grounds of objection. The other party may then choose to yield to the soundness of them, and to withhold the testimony; or the court, having its attention drawn to the true point, may keep it out of the case. Fountain v. Pettee, 38 N. Y. 184-186. The rule as stated in Levin v. Russell, supra, has been, perhaps, a little narrowed in Tooley v. Bacon, 70 N. Y. 34, by adding to it 'or unless the evidence in its essential nature be incompetent.'"

The evidence here was not in its essential nature incompetent. The facts embodied in the testimony were material; only the manner of proving them is involved in the objection now urged, and that objection was not specifically made on the trial.

[6] As to the objection to testimony relating to other securities, we think the transactions were not so unrelated to the one in question as to make the evidence incompetent. People v. Katz, 209 N. Y. 311, 103 N. E. 305, Ann. Cas. 1915A, 501; People v. Duffy, 212 N. Y. 57, 105 N. E. 839, L. R. A. 1915B, 103, Ann. Cas. 1915D, 176.

[7] We are also of the opinion that it was proper to show the pendency of the civil action. The complaint charged the defendant with misappropriating the bonds in question, and was pending when he left the city and went to Canada and England, secreting his whereabouts. As to the objection, which is now urged, that the answer was incompetent under section 523 of the Code of Civil Procedure, what has been said with reference to receiving in evidence the testimony of the defendant upon the discovery proceedings is largely applicable. No such objection was raised on the trial. Furthermore, the record does not show just what parts of the complaint or the answer were read to the jury. And in any event we are unable to see how the ruling was prejudicial to the defendant. There is nothing in his answer which is harmful, or connects him with the crime, except possibly it shows his relations to Harriet F. Newcomb and the management of her property, all of which is practically undisputed.

The other objections urged by the defendant need no special comment. We think none of them presents reversible error. It is true, as urged on behalf of the defendant, that a defendant charged with a crime must be prosecuted according to the forms of the law, and that his guilt must be established, if at all, by legal evidence. People v. Pettanza, 207 N. Y. 560, 101 N. E. 428. Upon the other hand, that salutary provision of law should not be overlooked, requiring an appellate court to give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties. Code of Criminal Procedure, § 542.

We are of the opinion that the defendant had a fair trial, that there are no errors which require or warrant the granting of a new trial, and that the judgment of conviction and the order denying a new trial should be affirmed. All concur, except LAMBERT, J., who dissents.

FOOTE, J. (concurring). I concur in the opinion of my Brothers KRUSE and DE ANGELIS. In addition, I have the following to suggest in reference to the objection now urged by defendant's counsel upon this appeal for the first time to the admissibility of defendant's testimony in the so-called discovery proceeding, based upon section 2443 of the Penal Code. That section is as follows:

"No person shall be excused from testifying, in any civil action or legal proceeding, to any facts showing that a thing in action has been bought, sold or received contrary to law, upon the ground that his testimony might tend to convict him of a crime but no evidence derived from the examination of such person shall be received against him upon a criminal prosecution."

Nothing in the testimony of defendant in the discovery proceedings shows or tended to show that the bonds defendant has been convicted of stealing had been bought, sold, or received contrary to law. It was conceded that he received these bonds as agent for Mrs. Newcomb, that his custody was her custody, and that these bonds were in his possession at the time of her death. A few weeks after her death, and on October 15th, he committed the larceny of which he has been

convicted by feloniously converting the bonds to his own use and delivering them to a broker, who sold them for his account. The bonds were not, I think, sold contrary to law, within the intent and meaning of this section. I think the conversion was complete at the time he delivered the bonds to Greene, the broker. ·

This statute should be construed with reference to its origin and history, in view of the purpose for which it was originally adopted. It first appears in chapter 259 of the Laws of 1818, entitled "An act to prevent abuses of the practice of the law and to regulate costs in certain cases." This act prevents attorneys from buying bonds, promissory notes, bills of exchange, or other choses in action for the purpose of commencing actions thereon. Section 2 gives a defendant, sued upon a chose in action so purchased by attorney, a right to examine the attorney or the plaintiff before trial, and provides:

"That any evidence derived from the examination of such attorney or counselor shall not be admitted in proof on any criminal prosecution against such attorney or counselor for a violation of the provisions of this act."

This statute was incorporated in the original Revised Statutes as a part of article 3, chapter 3, title 2, part 3, which article is entitled "Of the Officers of Courts of Record, Their Duties, Privileges and Liabilities." Section 82 of this article is as follows:

"No evidence derived from the examination of any such attorney, solicitor or counselor, shall be admitted in proof on any criminal prosecution against him, for violating any of the provisions of this article."

The section was in substance incorporated in the Penal Code adopted in 1881. The original draft of this Code was prepared by David Dudley Field and others, commissioners, in 1864, and reported to the Legislature in 1865. It was later revised by David Dudley Field and others in 1879, and was enacted as chapter 676 of the Laws of 1881. As originally drafted by the commissioners in their report to the Legislature in 1865, the present section was numbered section 200 and was as follows:

"No person shall be excused from testifying in any civil action to any facts showing that an evidence of debt or thing in action has been bought, sold or received contrary to law, upon ground that his testimony might tend to convict him of a crime. But no evidence derived from the examination of such person shall be received against him upon any criminal prosecution."

In their notes the commissioners refer to the above-mentioned article of the Revised Statutes and say:

"The sections of the Revised Statutes contain provisions, in detail, enabling a defendant to procure the testimony of the guilty party in aid of a defense setting up that the purchase of the demand in suit was contrary to law. Since the statute enabling either party to a suit to call his adversary as a witness these special provisions are no longer necessary to be retained." ·

Also:

"The commissioners have retained in the Penal Code the various provisions of the existing law whereby, in respect to particular crimes, the privilege to

refuse to testify is removed; e. g., in respect to buying demands for suit, dueling, etc. But they have added no new provisions of this character."

Thus the effort of the commissioners was simply to preserve the existing statutes in this respect. In the original Penal Code this statute became section 142 in practically the same form. In Chappell v. Chappell, 116 App. Div. 573, 101 N. Y. Supp. 846, this court had occasion to consider the history and interpretation of the then section 142 of the Penal Code. That was an appeal from an order of the Monroe Special Term, directing a defendant to appear before a referee to answer as to his knowledge concerning certain bonds and securities belonging to the estate of James W. Chappell, deceased, of which the plaintiff was the administrator, which bonds or securities it was alleged had been fraudulently obtained by the defendant from the deceased and concealed and withheld from plaintiff. The order was made on plaintiff's application to examine the defendant for the purpose of enabling the plaintiff to prepare his complaint. Defendant appeared before the referee, but refused to answer the questions on the ground that it might tend to incriminate him. It was contended on appeal that section 142 of the Penal Code compelled defendant to give the testimony and afforded him immunity. Mr. Justice Spring, in writing for this court, refers to the history of this section 142, and says that it and the associated sections are a substitute for the provisions of the Revised Statutes pertaining to the purchase of claims by attorneys, justices, and constables with a view to their collection. He refers to the above-quoted note of the commissioners, and says that the section does not assume to abrogate section 837 of the Code of Civil Procedure, and should not be extended beyond its restricted signification.

In view of the origin of this act, I think it should be construed to apply only to cases of the purchase, sale, or receipt of things in action, contrary to some statutory provision against it—not to a case where a thief sells the property he has stolen.

DE ANGELIS, J. (concurring). This is an appeal taken by the defendant from the judgment of the Monroe County Court, entered June 9, 1915, convicting him of the crime of grand larceny in the first degree.

The indictment charged the defendant with stealing from the Fidelity Trust Company of Rochester, on or about October 15, 1913, five first refunding mortgage sinking fund 5 per cent. gold bonds of Consolidated Coal Company of Maryland, conditioned for the payment of $1,000 each December 1, 1952, and interest semiannually, of the value of $5,000, numbered, respectively, 5939, 12123, 12124, 12125, and 12126. There are three counts in the indictment. The first charges the crime under subdivision 2 of section 1290 of the Penal Law; the second, under subdivision 1 of that section; and the third, in the common-law form for grand larceny.

The judgment is attacked on various grounds, but only four of

these grounds seem to merit our attention, to wit: (1) That there is a variance in the proof from the indictment; (2) that evidence was improperly received of crimes other than that charged in the indictment; (3) that the testimony of the defendant in a proceeding in the Surrogate's Court for the discovery of assets was improperly introduced in evidence by the district attorney; and (4) that the complaint and the defendant's answer in a civil action brought by the Trust Company against the defendant to recover the bonds described in the indictment and other property were improperly received in evidence. To the end that there may be a proper consideration of the questions raised by the appellant, a brief account of the facts and circumstances claimed by the respondents to establish the commission of the crime charged is necessary.

In about the year 1902 Harriet F. Newcomb, a widow of advanced years, was residing at No. 292 Oxford street, in the city of Rochester, N. Y. She had no children and no near relatives. Prior to that time she had made the acquaintance of Benjamin Hill Smith, the defendant, in Buffalo. He came to Rochester in about the year 1902, and soon thereafter began to assist Mrs. Newcomb in the settlement of her husband's estate. In about the year 1905 Smith became a member of her household, and remained such until the time of her death. They were very friendly, and he assisted her and acted as her agent in the matter of her investments and the management of her estate. Mrs. Newcomb transacted business with the Fidelity Trust Company of Rochester, and its attorneys, Duffy & McLean, did the principal part of her law business and drew her will and the codicils thereto.

On the 30th day of May, 1913, Mrs. Newcomb conveyed to the defendant a house on Washington street in Rochester and some lots in the state of Michigan. The conveyances were acknowledged before one Myron W. Greene, who will be referred to hereinafter. Mr. McLean, of the firm of Duffy & McLean, testified that the defendant came into his office one day and said that Mrs. Newcomb wanted him to prepare a deed from her to the defendant for this house and lot on North Washington street, and that he (McLean) told defendant that he would not do any such thing; that he told defendant that, any time that Mrs. Newcomb wanted him to do any business for her, she came to him and told him about it and talked to him about it; that he told defendant that she was a sick woman and an old woman, and "if she wants me to draw a deed to any property, she has a telephone in her house, and she can call me on the telephone, and I will go to her house if she is too sick to come to my office, and I don't propose to draw any deeds to you from her without orders from her direct." McLean testified that he never did receive any orders from her with reference to the property.

On the 24th day of September, 1913, Mrs. Newcomb died at her home, leaving a last will and testament. The original will was dated July 3, 1911. There were two codicils thereto, the first dated October 11, 1912, and the second dated August 11, 1913. The Fidelity Trust Company of Rochester was named as executor of the will. The peti-

tion for the probate of the will was dated October 1, 1913, and the will was admitted to probate October 10, 1913, and letters testamentary thereon issued to such Trust Company. In the original will Mrs. Newcomb gave general money legacies amounting to $111,000. Among them was a legacy to the defendant of $3,000. She gave her homestead, 292 Oxford street, Rochester, to her niece, Florence T. Brown, wife of Thomas Fox Brown, of Rochester, "together with all the furniture and the personal property kept and used in the house, except moneys, stocks, securities, and valuable papers," and also excepting certain furniture and articles.

By what may be regarded as the disposition of the residuum of the estate she directed the sale of her real estate (except her homestead) and the remainder of her property and the distribution of the proceeds among the general legatees in proportion to the amounts of their legacies, respectively, and in case her estate should not be sufficient to pay all the legacies in full she directed a proportionate reduction of each legacy whose amount exceeded $2,000. By the first codicil she makes a change in the disposition of her furniture and disposes of her jewelry, plate, pictures, china, and bric-a-brac, but otherwise ratifies her will. By the second codicil she revokes a legacy of $3,000 to Mrs. Farrington, and again ratifies her will in other respects. In neither of the codicils is the defendant mentioned.

Through an exchange with W. W. Kneath & Co. (dealing in Spencer Trask securities) of Kaw Valley bonds belonging to Mrs. Newcomb, she acquired and became the owner of the bonds described in the indictment on the 22d day of January, 1912. There is no dispute that she remained the owner of these bonds until as late, at least, as May 30, 1913. The claim of the people is that she owned them to the time of her death. The claim of the defendant is that she gave them to him about May 30, 1913. It is undisputed that the defendant sold them through Myron W. Greene, a Rochester broker, after the death of Mrs. Newcomb, and on the 15th day of October, 1913. The jury sustained the people's contention, and so found the defendant guilty of the crime of grand larceny.

Certain bonds and notes, described on the trial as "Spencer Trask securities," including the bonds described in the indictment, were purchased and owned by Mrs. Newcomb in her lifetime, which are described with other securities and obligations in schedule A annexed to the complaint in the action brought by the executor of Mrs. Newcomb's will against the defendant, and appearing at folio 565 of the appeal book. These Spencer Trask securities and the other obligations described in that schedule were, with one or two exceptions, indisputably purchased and owned by Mrs. Newcomb in her lifetime, and the others, while claimed by the defendant to be his and to have been purchased by him, are claimed by the people to have been in fact purchased either by Mrs. Newcomb or with her money, converted by the defendant to his own use, with criminal intent. To be more specific, the evidence shows conclusively that Mrs. Newcomb bought and paid for the bonds and obligations mentioned, at the prices and the

times, respectively, in the following table, and that the same are known in the case as the Spencer Trask securities:

|  | Date of Purchase. | Price. |
|---|---|---|
| Five first refunding 5 per cent. bonds of the Consolidated Coal Company of Maryland, conditioned for the payment of $1,000 each.. | January 22, 1912. | $ 4,350.00 |
| Ten first mortgage 5 per cent. bonds of Stephenville North & South Railway Company of Texas, conditioned for the payment of $1,000 each.......................... | March 15, 1913. | 9,600.00 |
| Five ten-year 5 per cent. gold notes of Central States Electric Corporation, for the payment of $1,000 each................... | November 18, 1912. | 4,625.00 |
| One 5 per cent. equipment bond of Virginia & Southwestern Railway Company, conditioned for the payment of $1,000:....... | August 18, 1913. | 990.70 |
| Five one-year 5 per cent. notes of New York, New Haven & Hartford Railroad Company, due December 1, 1913, for the payment of $1,000 each...................... | December 7, 1912. | 5,000.00 |
| Ten first 6 per cent. bonds of the Locomobile Company of America, conditioned for the payment of $1,000 each................. | October 29, 1912. | 9,750.00 |
| Three first mortgage 5 per cent. bonds of Burlington Railway & Light Company, conditioned for the payment of $1,000 each.. | September 24, 1912. | 2,835.00 |
| Fifteen first and refunding 5 per cent. bonds of Indiana Railway & Light Company, conditioned for the payment of $1,000 each, paid for March 15, 1913, temporary receipts then taken, for which bonds were delivered June 14, 1913................. | March 15, 1913. | 14,100.00 |

These so-called securities were transferable by delivery. It also appears that Mrs. Newcomb purchased of Myron W. Greene on the 16th day of August, 1909, ten bonds of the city of Seattle, state of Washington, conditioned for the payment of $1,000 each, for the sum of $10,000. The explanation of the purchase and disposition of these bonds appears in the testimony of Mr. Greene (folios 379 to 402) and presents by itself an interesting chapter in the history of the alleged crime. In view of the other evidence in the case, it would have justified the jury in believing that substantially all that Greene said that was favorable to the people was worthy of belief, and that substantially all that was said by him that was favorable to the defendant was unworthy of belief. Although called as a witness by the people, his relation to the transaction was of such a nature as to justify the jury in the belief that that much of his testimony was given in an effort to protect himself from suspicion of complicity with the defendant in the commission of the crime.

Referring again to the schedule annexed to the complaint in the action heretofore mentioned herein, the supposed property mentioned in such schedule described in the following seems not to have been sufficiently referred to in the evidence to call for further comment, other than to call attention to the fact:

One 5 per cent. consolidated gold bond of the Rochester Railway & Light Company, conditioned for the payment of $1,000.

Two 3½ per cent. convertible bonds of Pennsylvania Railway Company, conditioned for the payment of $1,000 each.

Five debenture bonds and 25 shares of stock of Dean Alvord Securities Company, conditioned for the payment of $1,000 each.

The record discloses (folio 140) that Mrs. Newcomb purchased from Harris Forbes & Co. five bonds of the Pacific Gas & Electric Company conditioned for the payment of $1,000 each, mentioned in the schedule referred to. Defendant also claims to be the owner of a certificate of deposit, No. 641, issued by Rochester Trust & Safe Deposit Company to Mrs. Newcomb September 2, 1909, for the payment of $10,000, also described in the schedule.

It appears that the defendant, through Mr. Greene, the broker, after the death of Mrs. Newcomb, sold and disposed of certain bonds and obligations referred to in the foregoing, described in the following, at the times and for the prices respectively stated in the following:

|  | Date of Sale. | Price. |
|---|---|---|
| Ten Stephenville North & South Railway Company bonds............................... | October 16, 1913. | $8,484.72 |
| Five Central States Electric Corporation gold notes .................................. | October 9, 1913. | 4,543.83 |
| One $1,000 Virginia & Southern Railway Company bond................................. | October 23, 1913. | 986.38 |
| Five Consolidated Coal Company of Maryland bonds (described in indictment)............. | October 15, 1913. | 4,343.75 |
| Five bonds of Pacific Gas & Electric Company | October 10, 1913. | 5,000.00 |

As already appears, Mrs. Newcomb died September 24, 1913, and on that same day the defendant saw Mr. McLean, the attorney who drew her will, and notified him of her death. By appointment Mr. Vollertson, assistant secretary of the Fidelity Trust Company, named as executor of Mrs. Newcomb's will, met the defendant at the late residence of Mrs. Newcomb on the 30th day of September, 1913, where he obtained from the defendant her silverware and jewelry. Vollertson testified that he asked the defendant if there were any other effects belonging to her which he thought ought to be in the possession of the executor, and that, receiving an answer in the affirmative, the defendant took Vollertson into the library and from a drawer or drawers in a desk took and handed to Vollertson stocks and mortgages amounting in value to more than $100,000, a list of which appears in the printed record. Vollertson further testified that, after he had expressed surprise that there should be this amount of valuable papers and securities lying around loose in the desk, he asked the defendant if there was anything else, and that the defendant replied that there was not. Vollertson further testified that he asked the defendant for Mrs. Newcomb's books of account, and that he replied that she had none; that when Vollertson asked defendant for her bank books he produced one or two; that he asked defendant for her canceled checks, and defendant said they had been de-

stroyed; that Thomas Brown was present on this occasion. Vollertson further testified that later in the day he went again to Mrs. Newcomb's house, and there met by appointment Thomas Brown, the husband of the niece to whom the house had been devised, and, in the absence of the defendant, discovered in the desk from which the defendant had taken the mortgages and stocks several books of account, Mrs. Newcomb's canceled vouchers, other passbooks, and other miscellaneous memoranda, which were produced on the trial. It appears that the books of account are in the defendant's handwriting and the vouchers were canceled checks bearing Mrs. Newcomb's signature. It appears that Vollertson found all of Mrs. Newcomb's canceled checks from January 1, 1909, and some previous to that date. It also appears that the bodies of the checks were in the handwriting of the defendant almost without exception.

It will be remembered that the will was filed with the petition for probate October 1, 1913, and was probated October 10, 1913. Quincy Van Voorhis testified that the defendant was at his house about the time the will was probated, and stated in a conversation that Mrs. Newcomb did not give him as much as people supposed; that she had given him the Washington street house and some lots in Michigan, $3,000 in her will, a claim of doubtful value in litigation against somebody by the name of Welch, a claim against the Dean Alvord Company, also of doubtful value, and that was all she had given him; that defendant on this occasion showed Mr. Van Voorhis a paper which purported to be an assignment of stocks of $5,000 or $6,000, and stated that there was a verbal understanding between him and Mrs. Newcomb that she would give him the dividends on these stocks as long as she lived, but that Thomas Brown had made a strong demand on him for these stocks, and he had given them to Brown.

Mr. Keyes, vice president of the Fidelity Trust Company, the executor of the will, testified that on October 18, 1913, he had a talk with the defendant, in which Keyes asked for Mrs. Newcomb's books of account and the defendant stated she had none; that Keyes told him he knew that was not so, because he had opened one book for her and showed her how to keep track of the accounts. At that time it will be remembered the executor had the canceled checks. Keyes testified that on that occasion the defendant stated that all the vouchers had been destroyed. Keyes further testified that on that occasion he asked the defendant to furnish him with a list of all bonds purchased from January 1, 1911, down to the time of Mrs. Newcomb's death, and that defendant agreed to furnish the list and bring it to Keyes' office on Monday, October 20, 1913, that defendant did not bring the list at the time agreed on, and that on October 21st Keyes called him by telephone and asked for the list, and the defendant responded that he was too busy to bring it to Keyes; that thereupon Keyes said he would come after it, and then defendant said that he had changed his mind and would not give Keyes the list. The proceedings for the discovery of assets of the estate of Mrs. Newcomb, under section 2707 of the Code of Civil Procedure (1913), were begun October 23, 1913, and a subpœna in those proceedings was served upon

the defendant that day. The hearing began about October 30, and ended about November 28, 1913.

Certain self-serving declarations of the defendant appear in the record, presenting his claim to the property in question. Edward P. Vollertson, assistant secretary of the executor, testified that on November 25, 1913, in a conversation with the defendant, the defendant said that on the 23d day of January, 1913, Mrs. Newcomb was very sick and did not expect to get well, and that Sister Ellen was in the house with her, and the latter telephoned defendant at E. P. Reed Shoe Factory, and that he went to the house and got a doctor for Mrs. Newcomb. Vollertson further testified that defendant stated that Mrs. Newcomb told him that she wanted him to have the Spencer Trask securities, and gave him the key to her safe deposit box at the Rochester Trust & Safe Deposit Company, and asked him to get some deeds which were there and have Mr. McLean draw some deeds conveying the Western property from Mrs. Newcomb to the defendant, and that Mr. McLean refused to draw the deeds, and that defendant did not want to open the safe deposit box alone and did not do so; that on the same day the doctor told defendant that Mrs. Newcomb had at least three more years to live, which defendant reported to her, and that after that she got better very rapidly; that on May 30, 1913, Decoration Day, various deeds to real estate were executed at 292 Oxford street, and that defendant called in Myron W. Greene, who took the acknowledgments; that later in Mrs. Newcomb's room, at a time when neither Esther Marks nor Myron Greene was in the house, and no one was present but Mrs. Newcomb and defendant, she gave him the so-called Spencer Trask securities and the $5,000 Pacific Gas bonds purchased from Harris Forbes & Co., *and that the understanding was that the defendant was to turn over all the interest to Mrs. Newcomb, and that he was to pay all the future household expenses;* that the defendant stated positively, as the result of specific inquiry from the witness, that *no one was present or witnessed this transaction, and that there was no writing of any kind and no list of securities made.*

Mr. Keyes, called as a witness on the part of the people, testified on cross-examination that the defendant told him that Mrs. Newcomb had transferred and delivered to him, some time before her death, a large number of securities. For some reason Mr. Keyes was not permitted to give the whole talk. He testified that the talk took place November 25, 1913.

Myron W. Greene, of whom we have already made mention, called as a witness on behalf of the people, testified on cross-examination that on May 30, 1913, when he took the acknowledgments to the deeds, Mrs. Newcomb said to him that she wished to transfer to the defendant—

"certain valuable securities, among which she handed me some. I had some deeds. No, I don't remember who handed me the deeds, but I had them in my possession; but I handed them to her, I guess, and she looked them over, and she said she wished to transfer these pieces of real estate of which these were the deeds to the property, to Mr. Smith; that it was a transaction between she (sic) and Mr. Smith, that was perfectly proper, and she wished me to understand that it was of her own free will, *and as I understand it she*

*told me that her will had been made, and she couldn't transfer this property to Mr. Smith in any other way,* and she wished me to take her acknowledgment, witness her signature to these deeds, which she was transferring to Mr. Smith."

Asked if Mr. Smith was present at the time, Greene said he was not. Pressed by direct questions, this witness responded to such questions, first, that he could not recall that the old lady said she *had* given defendant certain securities, but later he yielded to the pressure and testified that she stated that she *had* given him securities.

The defendant, by the cross-examination of Mr. McLean, drew from him certain of the testimony given by the defendant in the discovery proceedings, and, among other things, that the defendant testified that he had in his safe at his office on the 1st day of April, 1913, the bonds described in the indictment, and that they had been in his office from the day of their purchase, to wit, January 22, 1912, down to the time of Mrs. Newcomb's death, and that the defendant testified that Mrs. Newcomb had given him quite an amount of securities prior to her death. By this means the defendant not only secured for himself the benefit of self-serving declarations, but such declarations under his own oath.

William L. Parish, called as a witness by the people, testified that he had known the defendant for about six years and had been associated with him in business at 54 Mill street in Rochester, the business being repairing and refitting shoe machinery and sewing material; that this business was conducted under the name Regal Shoe Machinery Company; that he (Parish) worked upon a commission, and began working for the defendant in November, 1912, and continued to February, 1913; that he went back again and assumed management of the business practically on Saturday, following Labor Day, in 1914; that he saw the defendant last on Labor Day, 1914, and did not see him again until the month of February, 1915, when the defendant came back from Europe; that he received letters from the defendant in his absence. These letters were received in evidence.

The defendant called two witnesses to sustain his defense on the merits, to wit, Esther Marks and Lewis P. Warner.

Esther Marks had been called as a witness by the people, and on cross-examination had testified that the defendant was very kind to the old lady, and she and he were very friendly. It appeared that Esther had been a member of the old lady's household for 16 years prior to her death. She was asked if she ever heard the old lady call the defendant "son," and replied in the negative. She was asked if she ever saw any manifestations of affection between the old lady and the defendant, such as embracing and caressing, and said she had not. By a direct question she was led to answer that the old lady and defendant were like mother and son together. When called as a witness by the defendant, Esther testified that she had heard the old lady say that she did not know how she would live without the defendant, and that he was the salt of the earth, and that he used to do a lot of little things around the house to help the old lady, and that sometimes they ate together in her room.

Lewis P. Warner testified that he was a manufacturer of belting in Rochester and had known the defendant about 15 years; that the old lady knew that the defendant was a former partner of his; that the old lady used to address the defendant as "son"; that in 1913 the old lady said that she had given the defendant *some stock*—and continued:

"And of course I didn't want to pry in much, and she kept leading and telling one thing and another, and she said she had given him some Spencer Transit (sic) securities, practically all of it, and that he was to give—as I recall it, he was to give—her the dividends on those securities as long as she lived, and then, I suppose, after her death he would get them."

Warner testified that he became a partner of the defendant in 1904, and continued in such partnership two years, at the end of which time defendant went into the sewing machine business and bought some patents. On redirect examination Warner remembered that he had seen the bonds described in the indictment at the office of the defendant on Mill street in June, 1913.

The people argued with much force that Warner was unworthy of belief. Six witnesses, Parish and Warner among them, were called to testify to the defendant's good character.

It will be remembered that the action brought by the executor of Mrs. Newcomb's will against the defendant, to recover for the conversion of the securities and property claimed by the plaintiff to have been converted by the defendant to his own use, was commenced by the service of the summons November 28, 1913. This action was at issue and noticed for trial for the September Equity Term, 1914, *when the defendant, on or about September 8th, disappeared.* He first went to Canada, where he remained until about October 22, 1914, and then he sailed from Montreal, by the way of Halifax, for England. He reached London about October 31, 1914. He was indicted in Rochester December 14, 1914, arrested in London about January 25, 1915, and brought back to Rochester for trial. The trial began May 24, 1915, and the jury found him guilty of the crime charged in the indictment May 27, 1915.

Several letters written by the defendant during his absence from Rochester were put in evidence, and showed clearly his persistent effort to conceal his whereabouts. The estate of Mrs. Newcomb, as shown by the inventory, amounted to $230,000 or $240,000. Whether this includes the securities and property in dispute does not appear. It appears that the estate was charged a transfer tax on $276,000. The general legacies have been paid.

Thus we have a case where the jury was justified in finding the defendant guilty of the crime charged. The defendant had a fair trial, and the charge of the learned trial judge was impartial and quite as favorable to the defendant as he could have reasonably expected it to be. It is entirely true that flight creates no presumption of guilt, but it is equally true that flight, with other evidence of guilt, depending upon the peculiar circumstances of a case, may be a potent circumstance in the chain of circumstances upon which guilt may be predicated. In this case the jury had a right to consider the element

159 N.Y.S.—69

of flight as an important circumstance pointing to the guilt of the defendant.

Then we have the defendant's flight when about to be called upon to face the charge that he had unlawfully taken the property of this old lady; the fact that the defendant had been her trusted agent, and as such had handled and had possession from time to time of her securities; the fact that there was not the slightest evidence of the delivery of any of the securities in question from her, or from the defendant as her agent, to himself as an independent individual; the fact that there was no written evidence of any transfer of these securities to him, and not even a list of them made when it is claimed that she gave them to him; the fact that, although the claim is made that these securities were given to him about May 30, 1913, the second codicil to her will was made after that date and on August 13, 1913; the fact that Mrs. Newcomb concededly received the coupons and interest upon these securities up to the time of her death; the fact that the defendant received the reasonable legacy of $3,000 by her will, and claims by the gift to have received over $50,000; the fact that the excuse for not having the provision for the gift in the will was that the will was drawn, although she had made the last codicil to her will six weeks after the alleged gift; the fact that the defendant stated, soon after the death of Mrs. Newcomb, that she had given him no such property; the fact that he had disposed of more than $20,000 in value of these securities in so short a time after her death, without any disclosed need of the money, securities that were good investments; the fact that he made false statements to the effect that Mrs. Newcomb's canceled checks had been destroyed, and that she kept no books of account; and the fact that the excuse that the gift of the securities to the defendant was attended with the condition that the old lady should have the income therefrom during her lifetime might well be considered as unworthy of credence and offered in bad faith to account for the receipt by the old lady of such income down to the time of her death, a fact which, without explanation, would have been extremely persuasive that no gift had been made—these circumstances, and others that might be mentioned, tell the tale of a crime which merited the verdict rendered by the jury.

I shall now consider the four grounds of attack upon the judgment mentioned at the outset of this opinion:

(1) There is no variance in the proof from the crime charged in the indictment. The property claimed to be the subject of the larceny was definitely described in the indictment, and the proof clearly established the material allegations of the indictment.

(2) The ruling of the trial court in receiving the evidence of all the property taken by the defendant, of which that described in the indictment was a part, was right, and did not constitute an infraction of the general rule forbidding proof of crimes other than that charged in the indictment. This evidence simply involved the proof of an inseparable part of the whole transaction, and we may call it proof of "inseparable elements of the deed," or "concomitant parts of the criminal act," without offending Professor Wigmore. Wigmore on Evidence, § 218.

(3) That portion of the testimony of the defendant given in the discovery proceedings in the Surrogate's Court, introduced in evidence by the district attorney, was not objected to, upon the trial, upon the ground that its reception would violate section 2443 of the Penal Law, or any other provision of law. But, assuming, without deciding, that the testimony was incompetent, it did the defendant no harm. Substantially everything that was shown by the people by means of this testimony was shown by letters, checks, receipts, and other evidence, beyond controversy. In this connection it may well be observed that the counsel for the defendant made the first use of the discovery examination of the defendant, of any consequence, when he cross-examined Joseph McLean (folio 260 to 267 of the record).

At this time attention is called to the fact that the record upon which this appeal is prosecuted was made up carelessly, and in many instances what appears at the head of a page to be a "direct examination" is in fact "cross-examination," as witness these examples: In the people's case, from folio 144 to folio 157, Mr. Vollertson's cross-examination is headed "Direct"; from folio 167 to folio 171, the cross-examination of George J. Keyes is headed "Direct"; from folio 183 to folio 195, the cross-examination of Myron W. Greene is headed "Direct"; from folio 219 to folio 225, the cross-examination of Esther Marks is headed "Direct"; from folio 251 to folio 273, the cross-examination of Joseph McLean is headed "Direct"; and from folio 369 to folio 375, the cross-examination of Nellie M. Smith is headed "Direct."

(4) The defendant complains because the district attorney introduced in evidence the complaint and answer in the action brought by the executor against the defendant and others to recover for the alleged conversion of the securities in question. The district attorney stated that the pleadings were not offered to show the truth or falsity of any allegations set forth in the complaint, nor as evidence of conversion on the part of the defendant, but to show the claim that was made in the action that was about to be tried when the defendant took his flight, and to show further, by the allegations in the complaint and the admissions in the answer, the fact that the defendant was the agent of Mrs. Newcomb. I think the evidence was clearly competent to show that the claim was pending and about to be pressed against the defendant when he left the country. The admissions would seem to have been technically incompetent by reason of the last sentence of section 523 of the Code of Civil Procedure which reads as follows:

"A pleading cannot be used, in a criminal prosecution against the party, as proof of a fact admitted or alleged therein."

That objection was not raised upon the trial, and is urged upon this appeal for the first time. Assuming, without deciding, that the competency of the evidence may be questioned here, and that it should not have been received, the ruling of the trial judge was harmless, because other evidence in the case proved the agency beyond the shadow of a doubt.

Juries, in our system of jurisprudence, are credited with a reasonable amount of intelligence, and in these days we cannot assume that

they lack judgment and common sense. In this case the jurors were advised that a grand jury, a body of sworn officers of the law, had charged this defendant with the crime of which he stands convicted. The indictment was before the court, and what it charged was stated to the jury, not as evidence of the truth of the charge, but as the justification for the presentation of the defendant for trial. The jury were instructed that the indictment was no evidence of the defendant's guilt. When these pleadings were offered in evidence, they were offered with the distinct statement by the district attorney that the complaint was not offered as any evidence of the truth of the charge. The jury knew what the charge was. The jury knew that the indictment was being prosecuted by witnesses that were part of the agents of the executor of the will. How, then, could the defendant have been prejudiced by the introduction of the pleadings in evidence?

It may be said generally in the case that the testimony of the defendant in the discovery proceedings and his answer in the action were clearly more beneficial than harmful to him in any view of the case. He was not sworn upon the trial, but in both of these pieces of evidence he had the benefit of his sworn denial of the crime with the commission of which he was charged in the indictment.

I think the judgment of conviction should be affirmed.

LAMBERT, J. (dissenting). The defendant appeals from a conviction of grand larceny in the first degree. It is charged that he converted to his own use five certain bonds, while same were in his possession as agent and bailee of the Fidelity Trust Company of Rochester, N. Y.

One Harriet F. Newcomb died in September, 1913, leaving a last will and testament, of which she named the Fidelity Trust Company of Rochester as executor. In her lifetime she had reposed in the defendant great confidence, and had intrusted to him many, if not all, of her business matters. So far as is disclosed by the record, he respected that confidence so long as she lived. He did her banking, attended to her investments, and generally looked after her business matters. Such course of conduct brought into his possession many securities belonging to deceased, and upon her death many of such remained in his possession. Of these a number were transferable by delivery only.

Following her death the trust company made demand upon defendant for such securities as remained in his possession, together with all books of account, memoranda, etc., involved in her estate. Later discovery proceedings were instituted, and the defendant was therein examined as a witness, with reference to his entire connection with the estate of deceased. Eventually the trust company brought action against defendant, seeking to recover the value of some $85,000 worth of these securities. In that action defendant filed an answer, but, when same came on for trial, did not contest. Judgment was recovered against him. Following his examination in the discovery proceedings and the filing of his answer in the civil action, defendant left Rochester, went to Canada, and later to London, England. From this latter place he was extradited and brought back to answer this indictment.

Defendant strenuously asserts a claimed variance between the pleading and proof, in that he is charged with conversion as bailee of the Fidelity Trust Company, while the proof is that he converted securities formerly belonging to Mrs. Newcomb. His contention in this particular is not sound. Upon Mrs. Newcomb's death, title to the securities she then owned passed, under her will, to the trust company as her executor, and the defendant, although formerly bailee and agent for Mrs. Newcomb, thereupon and by operation of law held the securities as agent and bailee for the trust company. Phelps v. People, 72 N. Y. 334–357; People v. Bennett, 37 N. Y. 117, 93 Am. Dec. 551.

There are, however, serious errors urged. Upon the trial, the assistant district attorney offered in evidence and read to the jury excerpts from the testimony of the defendant taken in the discovery proceedings. Objection to this evidence was repeatedly made by the defendant, upon the ground that it was incompetent and immaterial. The admission of this evidence over such objection and exception is now urged as error requiring reversal. The real objection to this proof lies in section 2443 of the Penal Law, which provides as follows:

"No person shall be excused from testifying, in any civil action or legal proceeding, to any facts showing that a thing in action has been bought, sold or received contrary to law, upon the ground that his testimony might tend to convict him of a crime. But no evidence derived from the examination of such person shall be received against him upon a criminal prosecution."

It is true that the rule is now well settled that such a statutory provision, attempting to take from a witness his constitutional privilege to decline to answer any question, the answer to which might incriminate him, is wholly ineffectual in that particular. Chappell v. Chappell, 116 App. Div. 578, 101 N. Y. Supp. 846. The defendant might have declined to answer in the discovery proceedings, in the exercise of his constitutional privilege. But this he did not do, and hence his evidence is probably voluntary. However, the above-quoted section of the Penal Law goes much further and distinctly provides that the evidence of the witness taken in that manner shall not be used against him in a criminal prosecution. Nor is this latter provision in any wise dependent upon the one preceding. It is not made to depend upon the claim of privilege, either by a logical reading of the entire section or by its grammatical construction. This evidence, then, was incompetent, by reason of this express provision of the statute.

In answer to this suggestion, the assistant district attorney calls attention to the fact that the objection did not specify the true reason for excluding the evidence, and he argues that the mere general objection does not suffice to present this question. We are familiar with many instances where appellate courts have declined to recognize the validity of exceptions based upon general and indefinite objection. Sanford v. Ellithorp, 95 N. Y. 48; Hoar v. Hoar, 23 Hun, 33; Stevens v. Brennan, 79 N. Y. 254.

The object of the rule requiring objections to evidence to be made specific and to point out the precise defect urged is to prevent surprise and to enable the court and counsel to obviate the objection by either reframing the question or by making additional proof which

will cure it. People v. Beach, 87 N. Y. 512. Bergmann v. Jones, 94 N. Y. 51. In those instances, where it is apparent that the objection cannot be obviated by any means within the power of the party offering the evidence, it is usually sufficient to make general objection thereto. Such objection then presents the defect urged. Quinby v. Strauss, 90 N. Y. 664; Tooley v. Bacon, 70 N. Y. 34; People v. Place, 157 N. Y. 584–601, 52 N. E. 576; A. P. Company v. Gardner, 39 App. Div. 654, 57 N. Y. Supp. 353; West v. N. Y. C. & H. R. R. Co., 55 App. Div. 464–467, 67 N. Y. Supp. 104; Wallace v. Vacuum Oil Co., 128 N. Y. 579, 27 N. E. 956. It seems quite apparent that the objection to this evidence could not be obviated in view of the explicit statutory prohibition against its introduction. We conclude, therefore, that its admission was error.

The prejudicial effect of this evidence cannot be well overestimated. The evidence read to the jury embodied charges of conversion against the defendant of many other securities, involving large amounts of money, and the case, as finally submitted, contained these further charges, substantiated to some extent by the evidence of the defendant thus improperly introduced. From this evidence the jury might well spell out further accusations against the defendant. Such scarcely rise to the dignity of proof of other thefts or conversions, but are accusations of such.

Our courts have repeatedly condemned the injection into criminal cases of mere accusations or suggestions of the commission of other and different crimes by a defendant upon trial in a criminal case. As was said in People v. Crapo, 76 N. Y. 288–291, 32 Am. Rep. 302:

"It is not legitimate to bolster up a weak case by probabilities based upon other transactions. An accused person is required to meet the specific charge made against him, and is not called upon to defend himself against every act of his life."

Evidence of a similar character was likewise strongly condemned in People v. Cascone, 185 N. Y. 317, 78 N. E. 287, and People v. Sekeson, 111 App. Div. 490–498, 97 N. Y. Supp. 917.

What is said above, with reference to this class of evidence, applies with even more force to the introduction in evidence of the complaint and answer in the civil action. These pleadings were admitted in the face of the provisions of section 523 of the Code of Civil Procedure, wherein it is provided:

"A pleading cannot be used, in a criminal prosecution against the party, as proof of a fact admitted or alleged therein."

The harmful character of this evidence is even more apparent. The multifarious charges of conversion are here again presented, and presented in the form of accusation only. In attempted justification of the introduction of these pleadings, the assistant district attorney argues that section 523 of the Code of Civil Procedure prohibits this evidence only as to the facts alleged or denied in the pleadings; and such seems to be the wording of that section. He ingeniously argues that such evidence was not introduced for that prohibited purpose; that it finds its place in the case as a part of the general history, going

to make up proof of the guilty intent of the defendant; and that, as such, it was competent and properly admitted.

Giving full faith to the contention of the assistant district attorney that these pleadings have probative force upon the question of intent, we would then have presented evidence competent upon that theory, and yet incompetent upon another theory and expressly prohibited by statute. Once before the jury, these pleadings become evidentiary for all purposes. The jury might take them into the jury room, read them, and draw from them the natural and logical conclusion that defendant was charged therein with the conversion of many other securities.

Somewhat of a similar situation was presented in the recent case of People v. Buffom, 214 N. Y. 53, 108 N. E. 184. In that case the defendant was on trial for murder of her husband. It was charged that the means employed was arsenical poisoning. The effect of small and repeated doses of arsenic upon the human system was being sharply litigated. The district attorney was there permitted to prove the death of a daughter of defendant, occurring subsequent to the indictment, together with the conditions discovered both prior to her death and as revealed by an autopsy after it. This proof was permitted by the trial court, upon the theory that it had probative force upon the contested issue of the effect of arsenical poisoning and that court attempted to limit the jury in its consideration thereof to that one proposition. The Court of Appeals, in discussing that line of proof, distinctly held the evidence incompetent, even upon the restricted theory adopted by the trial court, and although there was the merest suggestion that the defendant was guilty of poisoning her daughter as well as her husband, and although that suggestion did not obtain the formality of a charge to that effect, yet the Court of Appeals saw fit to reverse that conviction because of the admission of that evidence.

Whatever impression this court may have as to the guilt of the defendant, we are convinced that the trial he has had was not such as is guaranteed him by the Constitution. We cannot say that the above-mentioned errors were not prejudicial to him, or that same did not, in the minds of the jury, prove the controlling factor in overcoming that reasonable doubt which they might have had as to the guilt of the defendant.

For the foregoing reasons, the judgment of conviction should be reversed, and a new trial ordered.